STATE OF HAWAII, by its Commissioner of Securities, Plaintiff-Appellee, *v.* HAWAII MARKET CENTER, INC., STUART M. COWAN, DON R. SELLEY, JAMES ROSE and ARTHUR AWAYA, Individually and as Officers and/or Directors of HAWAII MARKET CENTER, INC., Defendants-Appellants.

No. 4958.

May 20, 1971.

Richardson, C.J., Marumoto, Abe, Levinson and Kobayashi, JJ.

OPINION OF THE COURT BY LEVINSON, J.

The legal issue presented by this case is whether the "Founder-Member Purchasing Contract Agreements" issued by Hawaii Market Center, Inc., one of the appellants, constitute securities within the meaning of the Hawaii Uniform Securities Act (Modified), HRS § 485-1(12).[1] An affirmative answer to this question would bring into operation the registration requirements of HRS § 485-8. Before determining the nature of these agreements it is first necessary to delineate clearly the economic relationship existing between Hawaii Market Center, Inc. and persons who have contracted with it pursuant to these agreements.

Hawaii Market Center, Inc. (hereinafter referred to as HMC) is a Hawaii corporation with a capitalization of $1000.00. The corporation's expressed purpose was to open a retail store which would sell merchandise only to persons possessing purchase authorization cards. In order to raise capital for the financing of this enterprise HMC recruited founder-members. The maximum number of such members was set at five thousand.

---

[1] HRS § 485-1(12) provides:

"Security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, certificate of interest in an oil, gas, or mining title or lease, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed number of dollars either in a lump sum or periodically for life or some other specified period.

Prospective founder members were asked to attend recruitment meetings. At these meetings a speaker explained how members would be eligible to earn (1) immediate income before the store became operational, and (2) future income after the store became operational. In order to earn such income an invitee was required to become either a founder-member distributor or a founder-member supervisor.

A person became a founder-member distributor by purchasing from HMC either a sewing machine or a cookware set (each with a wholesale value of $70.00) for $320.00. The purchaser also executed a "Founder-Member Purchasing Contract Agreement" with the corporation. This agreement states that a distributor is able to earn money in five ways. He may: (1) distribute the 50 authorized buyer's cards, which have been issued to him and thereafter earn a 10% commission on each sale resulting from the use of one of these cards in the HMC store; (2) earn a $50.00 fee each time a person he refers becomes a founder-member distributor; (3) receive a $300.00 fee as compensation for establishing a new member as a supervisor or upgrading an old member from distributor to supervisor. The fourth and fifth sources of income relate to the earning of credits which are applied to a $900.00 fee paid by a distributor to his supervisor if the distributor wishes to be upgraded.

A person became a supervisor by executing a founder-member contract and purchasing both a sewing machine and a cookware set for a total price of $820.00. A supervisor earns higher fees and commissions than a distributor. In addition, a supervisor receives an override commission if his distributor enlists a new member. He also receives override commissions on all sales made to holders of purchase authorization cards distributed by any founder-member whose entry into the organization can be traced back to the supervisor.

On September 23, 1969 the appellee, the State of Hawaii, by its Commissioner of Securities, filed an action in the First Circuit Court against HMC and its officers and directors. The State sought to enjoin the further promotion and execution of the above described founder-member contracts. The commissioner argued that the contracts were unregistered securities whose distribution was prohibited by the Uniform Securities Act (Modified). HRS § 485-8. The appellants contended that the contracts in question were not securities within the meaning of the Act.

On October 20, 1969 the trial court entered its findings of fact, conclusions of law and judgment in favor of the Commissioner of Securities. After a thorough analysis of the economic realities underlying the relationship between the defendant corporation and its founder-members the court held that the HMC agreements constituted "investment contracts" and "certificates of interest or participation in a profit sharing agreement" and, therefore, fell within the Hawaii statute's definition of "security," as defined by HRS § 485-1(12). The court enjoined the further promotion and execution of founder-member purchasing contract agreements and the collection and disbursement of funds pursuant to such agreements. The appellants have appealed from this judgment and order. For the reasons set forth below we affirm.

I. THE ESSENTIAL CHARACTERISTICS OF AN INVESTMENT CONTRACT UNDER THE HAWAII UNIFORM SECURITIES ACT (MODIFIED).

A. *The Test Embodied in the* Howey *Case is Too Mechanical to Protect the Investing Public Adequately.*

In arguing whether the interests represented by HMC's founder-member contracts constitute investment contract securities within the meaning of HRS § 485-1(12) both

the appellant and the appellee rely for guidance principally upon the Supreme Court decision in *Securities & Exchange Commission* v. *W. J. Howey Co.,* 328 U.S. 293 (1946). That case sought to formulate a test for the existence of an "investment contract," such a contract being included within the definition of "security" under the Federal Securities Act. The Court concluded that an investment contract exists whenever "a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Securities & Exchange Commission* v. *W. J. Howey Co., supra* at 299.

The appellants urge us to adopt the *Howey* formula as the test to be applied in the present case. It is contended that under the *Howey* test the contracts in question are not investment contracts because founder-members in the HMC plan are expected to recruit new members and distribute purchase authorization cards in order to earn income; they do not, therefore, "expect profits solely from the efforts" of others. *Gallion* v. *Alabama Market Centers, Inc.,* 282 Ala. 679, 213 So.2d 841 (Ala. 1968); *Emery* v. *So-Soft of Ohio, Inc.,* 30 Ohio Op. 2d 226, 199 N.E.2d 120 (Ohio Ct. App. 1964).

The State also relies upon the *Howey* case but contends that the test enunciated therein is not to be taken literally. It argues that the efforts expected of the founder-members are minimal in nature and, as a practical matter, the founders are substantially dependent upon the management of the corporation for a successful return on their investment. Thus the State asserts, under the real meaning of the *Howey* rule, the disputed agreements are investment contracts. *D.M.C. of Colorado, Inc.* v. *Hays,* 3 CCH Blue Sky L. Rptr., ¶ 70,897 at 67,042 (Colo. Dist. Ct. 2/26/71); *see Florida Discount Centers, Inc.* v. *Antinori,* 226 So.2d 693 (Fla. Dist. Ct. App. 1969), *aff'd* 232 So.2d

17 (Fla. 1970). We agree that the present agreements constitute "securities" within the coverage of the Hawaii Uniform Securities Act (Modified). We do not choose, however, to base this decision on the restrictive formula laid down by the Supreme Court in the *Howey* case.[2]

The primary weakness of the *Howey* formula is that it has led courts to analyse investment projects mechanically, based on a narrow concept of investor participation.[3] *See Gallion* v. *Alabama Market Centers, Inc., supra; Emery* v. *So-Soft of Ohio, Inc., supra.* Thus courts become entrapped in polemics over the meaning of the word "solely" and fail to consider the more fundamental question whether the statutory policy of affording broad protection to investors should be applied even to those situations where an investor is not inactive, but participates to a limited degree in the operation of the business.[4] In fulfilling the remedial purposes of our state act, we believe a sounder approach to securities regulation requires that courts focus their attention on the economic realities of security transactions: that is, "[t]he placing of capital or laying out of money in a way intended to secure income or profit from its employment" in an enterprise. *State*

---

[2] The Supreme Court in the *Howey* case was interpreting a federal statute. Although the language of that statute is similar to our own securities law, we are not, contrary to the assertions of the appellants, bound to follow blindly the federal interpretation. This court will construe the provisions of state statutes "not in total disregard of federal interpretations of identical language, but with reference to the wisdom of adopting those interpretations for our state." State v. Texeira, 50 Haw. 138, 142 n.2, 433 P.2d 593, 597 n.2 (1967).

[3] In the *Howey* case the Supreme Court was faced only with the question whether a scheme involving no actual investor participation was an investment contract. That court has not yet decided whether an investment plan involving non-managerial investor participation also falls within the concept of an investment contract security.

[4] For a discussion of the need to protect non-managerial investors who participate in an enterprise *see* Goodwin, *Franchising in the Economy: The Franchise Agreement as a Security Under Securities Acts, Including 10b-5 Considerations,* 24 Business Lawyer 1311, 1318-19 (1969).

v. *Gopher Tire & Rubber Co.,* 146 Minn. 52, 56, 177 N.W. 937, 938 (1920).

B. *The Risk Capital Approach to Defining an Investment Contract.*

The salient feature of securities sales is the public solicitation of venture capital to be used in a business enterprise. *Silver Hills Country Club* v. *Sobieski,* 55 Cal. 2d 811, 815, 13 Cal. Rptr. 186, 188, 361 P.2d 906, 908 (1961); Goodwin, *Franchising in the Economy: The Franchise Agreement as a Security Under Securities Acts, Including 10b-5 Considerations,* 24 Business Lawyer 1311, 1320-21 (1969). This subjection of the investor's money to the risks of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction. Coffey, *The Economic Realities of a "Security": Is There a More Meaningful Formula?,* 18 W. Res. L. Rev. 367, 412 (1967); *see Silver Hills Country Club* v. *Sobieski, supra; see Securities & Exchange Commission* v. *Latta,* 250 F. Supp. 170, 173 (N.D. Cal. 1965), *aff'd per curiam,* 356 F.2d 103 (9th Cir. 1965), *cert. denied,* 384 U.S. 940 (1966). Any formula which purports to guide courts in determining whether a security exists should recognize this essential reality and be broad enough to fulfill the remedial purposes of the Securities Act. Those purposes are (1) to prevent fraud, and (2) to protect the public against the imposition of unsubstantial schemes by regulating the transactions by which promoters go to the public for risk capital. HRS § 485-10(e). Therefore, we hold that for the purposes of the Hawaii Uniform Securities Act (Modified) an investment contract is created whenever:[5]

---

[5] This test is suggested by Professor Coffey in his excellent article analysing the essential economic characteristics of security transactions. Coffey, *The Economic Realities of a "Security": Is There a More Meaningful Formula?,* 18 W. Res. L. Rev. 367, 377 (1967).

(1) An offeree furnishes initial value to an offeror, and

(2) a portion of this initial value is subjected to the risks of the enterprise, and

(3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

(4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

The above test provides, we believe, the necessary broad coverage to protect the public from the novel as well as the conventional forms of financing enterprises. Its utility is best demonstrated by its application to the facts in the instant case.

## II. THE CONTRACTS IN QUESTION CONSTITUTE INVESTMENT CONTRACTS WITHIN THE MEANING OF HRS § 485-1(12).

### A. *The Initial Value Subjected to the Risks of the Enterprise.*

Each person who executes a "Founder-Member Purchasing Contract Agreement" is required by Hawaii Market Center, Inc. to make a "one-time retail purchase" of $320.00 in order to become a distributor and $820.00 in order to become a supervisor. The record indicates that the total wholesale cost to HMC of the purchased merchandise is $70.00 and $140.00 respectively. The appellants have made no attempt to characterize these transactions as the simple purchase of merchandise, nor do we deem them such. The terms of the offer and the inducements held out to the prospects clearly indicate that the substan-

tial premiums paid by founder-members to HMC are given in consideration for the right to receive future income from the corporation. These overcharges constitute the offerees' investments or contributions of initial value, such value being subjected to the risks of the enterprise.

It is uncontested that the recruitment of founder-members was motivated by the need to raise capital to finance the opening of the proposed Hawaii Market Center store. Inextricably bound to the success of this enterprise is the ability of the founder-members to recoup their initial investment and earn income. The recruitment fee paid to distributors and supervisors, during the pre-operational phase of the plan, rests upon the promoters' ability to sell the success of the plan to prospective members. In addition, those members who choose to rely solely on the second method of earning income, the payment of commissions based on sales, receive no return at all on their investment unless the store functions successfully. This latter point is particularly important because recruitment of members increases geometrically. Therefore, since membership is limited to five thousand, a very large percentage of founder-members will be totally dependent on sales commissions to recover their initial investment plus income. It is thus apparent that the security of the founder-members' investments is inseparable from the risks of the enterprise. The success of the plan is the common "thread on which everybody's beads [are] strung." *Securities & Exchange Commission* v. *C. M. Joiner Leasing Corp.,* 320 U.S. 344, 348 (1943).

B. *The Promise of a Valuable Return on the Offeree's Investment.*

The appellants contend that because of the nature of the receipts promised to founder-members the trial court erred in finding the existence of a security. They stress

that founder-members do not participate in the profits of the enterprise. They are promised fixed fees and commissions, which are payable regardless of the existence of profits. Therefore, it is argued, the essential profit sharing element of a security is lacking. *Commonwealth ex rel. Pennsylvania Securities Commission* v. *Consumers Research Consultants, Inc.,* 414 Pa. 253, 256, 199 A.2d 428, 429 (1964). Once again, this argument ignores the economic realities underlying securities regulation.

It should be irrelevant to the protective policies of the securities laws that the inducements leading an investor to risk his initial investment are founded on promises of fixed returns rather than a share of profits. The reference point should be the offeree's expectations, not the balance sheet of the offeror corporation. The unwary investor lured by promises of fixed fees deserves the same protection as a participant in a profit sharing plan. For this reason courts have avoided a narrow definition of "profits." They have recognized securities sales even where the promised benefits to the offeree were indirect, arising from an anticipated increase in the value of the property received, rather than direct payments from the offeror. *Securities & Exchange Commission* v. *C. M. Joiner Leasing Corp., supra* at 348-49; *Roe* v. *United States,* 287 F.2d 435, 439 (5th Cir.), *cert. denied,* 368 U.S. 824 (1961). Thus, the fact that in the instant case HMC guaranteed the offerees amounts of money independent of enterprise profits does not undermine the investment nature of the transactions.

### C. *The Lack of Managerial Control Over the Enterprise.*

Finally, as previously stated, it is irrelevant to the remedial purposes of the Securities Act that an investor participates in a minor way in the operations of the enter-

prise. Courts should focus on the quality of the participation. In order to negate the finding of a security the offeree should have practical and actual control over the managerial decisions of the enterprise. For it is this control which gives the offeree the opportunity to safeguard his own investment, thus obviating the need for state intervention. Coffey, *The Economic Realities of a "Security": Is There a More Meaningful Formula?, supra* at 396-98.

In the present case the founder-members possess none of the incidents of managerial control which would preclude the finding of a security. The members have no power to influence the utilization of the accumulated capital. Nor will they have any authority over those decisions which will affect the operation of the store, if it is successfully established. Judged by an ability to protect their original investment, the offerees in this case are powerless. Thus, under the economic realities approach presently advocated, they properly belong to the class of investors falling within the remedial purposes of the Securities Act. Therefore we hold that the present agreements are investment contracts within the meaning of the Hawaii Uniform Securities Act (Modified) and must be registered with the Commissioner of Securities prior to distribution.

Judgment affirmed.

*David T. Robertson* (*Hyman M. Greenstein* and *Larry S. Vines* on the briefs) for defendants-appellants.

*Roy M. Miyamoto,* Deputy Attorney General (*Bertram T. Kanbara,* Attorney General, *Olen E. Leonard, Jr., Gerald Y. Y. Chang,* Deputy Attorneys General, with him on the brief) for plaintiff-appellee.