Glenn R. SCHULTZ and C. Murrelle
WATKINS *v.* RECTOR-PHILLIPS-MORSE,
INC. et al

76-264                                    552 S.W. 2d 4

Opinion delivered June 6, 1977
(In Banc)

771

*Moses, McClellan, Arnold, Owen & McDermott,* by: *Wayne W. Owen,* for appellants.

*Rose, Nash, Williamson, Carroll, Clay & Giroir,* for appellees.

*Harvey L. Bell,* Securities Comm'r, for State of Arkansas Securities Dept., Amicus Curiae.

BRADLEY D. JESSON, Special Justice. This appeal involves two separate lawsuits, one by Glenn R. Schultz and one by C. Murrelle Watkins, each filed in separate divisions of the Pulaski Chancery Court on the same date, for the recovery of $47,000.00 each, against the sellers of alleged unregistered securities. The sellers of the alleged securities were the Defendants and Appellees, Rector-Phillips-Morse, Inc., W. F. Rector and Byron R. Morse. The $47,000.00 amount represents the purchase price of joint venture interests which the Appellants purchased in an apartment complex. The Appellants contend that these interests constitute unregistered securities. In the suit they seek recovery of the amount of the purchase price, together with interest from the date of the purchase, less amounts received as dividends therefrom, plus attorneys' fees, all in accordance with Ark. Stat. Ann. § 67-1256 (Repl. 1966).

The two lawsuits arose out of basically the same transaction. The Appellants each purchased an interest in a joint venture, promulgated by Rector-Phillips-Morse, Inc., to construct a garden-type apartment complex at Stuttgart, Arkansas. The project was referred to as "Stuttgart 221", the "221" being the designation assigned this type of project pursuant to the Federal Housing Administration Act. The general scheme of the operation was that the sponsor of the project would raise the equity capital, and the Federal Housing Administration would guarantee a loan to supplement that equity toward financing the entire project. The plan of this operation was set forth by Rector-Phillips-Morse, in a "confidential information", which constituted an offer to certain individuals interested in taking advantage of defined tax losses under what is commonly referred to as a "tax shelter" investment. This particular project was severed into 10% interest "units".

Rector-Phillips-Morse was a substantial real estate con-

cern headed by the late Billy Rector. Rector and Byron Morse, principals in Rector-Phillips-Morse, Inc., and its affiliated companies, through their employees, delivered the "confidential information" which was in the nature of an offer to sell the 10% units to certain individuals. The Appellants herein were informed of the offer to sell by Vernon Giss, who had received a "confidential information". The Appellants indicated interest in the investment and they contacted representatives of Rector-Phillips-Morse. The Appellant Watkins met with representatives of Rector-Phillips-Morse, and the nature of the project was discussed with him. Watkins, in turn, conveyed this information to Schultz. Thereafter, each of the Appellants subscribed to two units, being 20% participation each in the project. A 50% participation was sold to Central Distribution Centers, Inc. and a 10% interest, or one unit, was sold to E. DeMatt Henderson. All of the percentage ownerships were subject to a 1% ownership interest retained by a Rector-Phillips-Morse subsidiary, and a 1% interest retained by a Pickens-Bond Construction Company subsidiary, known as Apartment Developers Corporation. The cost of the two units to each of the Appellants was $47,000.00.

In the "confidential information" there was a computation provided by Rector-Phillips-Morse which showed the approximate loss deductions each one of the investors might anticipate taking for the next 40 years. The "confidential information" also stated that the books of the joint venture would be audited by an independent certified public accountant who would furnish annually a partnership income tax return showing the amounts which each investor was entitled to take as a deduction from his income for tax purposes.

Both of the Appellants are Vice-Presidents of Stephens, Inc., an investment firm headquartered in Little Rock. Both are licensed as stockbrokers by the National Association of Securities Dealers, and have long experience in the brokerage of securities. They sought this investment primarily as a tax shelter, because each was in a high personal income tax bracket.

The "Stuttgart 221" project initially was to be a joint ven-

ture between a subsidiary of Rector-Phillips-Morse and a subsidiary of Pickens-Bond Construction Company. However, after the arrangements for the construction were made, and some time after the project was under way, Phillips-Morse Construction Company, a subsidiary of Rector-Phillips-Morse, withdrew from the active construction of the project, and Apartment Developers Corporation, the Pickens-Bond Subsidiary, completed the project.

In November of 1972, the four investors, Schultz, Watkins, Central Distribution and Henderson, together with Apartment Developers Corporation, the Pickens-Bond subsidiary, and Phillips-Morse Construction Company, executed a "joint venture" agreement, undertaking this project and outlining the rights, duties and obligations of all of the owners of it. The corporation known as Stuttgart Apartments, Inc. had been formed in August of 1972, for the purpose of taking title to the apartment project. Stuttgart Apartments, Inc. still own title to the land, but has executed a trust agreement acknowledging that it holds title as trustee for the benefit of the four investors and Apartment Developers Corporation and Phillips-Morse Construction Company. The Board of Directors of Stuttgart Apartments, Inc. consists entirely of employees of Rector-Phillips-Morse, with the exception of one representative who was an officer of Pickens-Bond. Under the terms of the Trust Agreement, Stuttgart Apartments, Inc., as Trustee, was given full power to develop, manage, mortgage or sell the property of the joint venture and to enter into contracts with third parties upon such terms as the Trustee deemed reasonable. In this connection, Stuttgart Apartments, Inc. executed the mortgage to the Federal Housing Administration and received all of the draws from the company temporarily financing the project, and in turn, disbursed all of such funds. The Trustee also contracted to manage the apartments, which, when fully rented, would pay to the Trustee a management fee of $1200.00 per month.

After the Appellants and the other two "investors" had paid the full amount of their investment, Rector-Phillips paid to itself from the investment funds a "consultation fee" of approximately $28,000.00. In addition it was to receive an an-

nual consultation fee of $100.00. Other remunerations were received by Rector-Phillips-Morse indirectly through commissions paid to Rector-Means and Roland, an insurance agency having overlapping ownership with Rector-Phillips-Morse.

After the first year's operation of the apartments, the Appellants were furnished a partnership return in accordance with the "confidential information", which showed that each of them was entitled to take some $15,000.00 loss deduction. They took this loss on their individual tax returns and the Internal Revenue Service, on audit, disallowed a substantial amount of the claimed loss. While it is not clear in the record, it appears that the Appellants and the IRS are still in a dispute concerning the validity and amount of the claimed loss. In any event, the IRS did make a deficiency assessment against both of the Appellants, and it again appears from the record that this was based largely upon the IRS contention that many of the "start up" expenses should have been capitalized and deducted over a period of years, rather than taken the first year. The Appellants have likewise taken tax deductions based on their ownership interest in the apartment complex for each of the tax years thereafter. They have each received income from the investment, including some $3,100.00 in income from the operation of the apartments during the pendency of this action. The apartment complex has had a successful operation and has a ninety-seven percent (97%) occupancy rate.

After learning of the deficiency assessments by the Internal Revenue Service, the Appellants tendered their interest in the joint venture back to the Appellees as provided by statute, and asked for a rescission of the sale, which was refused. These actions were then commenced.

The Appellants contend that the interest in the joint venture in the Stuttgart 221 project is a security within the meaning of the Arkansas Securities Act, and that these securities were not registered and were not exempt from registration. There is no allegation of any fraud or misrepresentation in connection with the Appellants' purchase of the joint venture interest.

In the trial below, the learned Chancellor held that the interest in the joint venture purchased by the Appellants constituted securities. He found, however, that the private offering exemption, Ark. Stat. Ann. § 67-1248(b)(9) (Supp. 1975) and Rule 8, F(3) of the Arkansas Securities Division, were applicable to the transaction, and that, therefore, there was no violation of the Securities Act. The Chancellor further found that the Appellants were trained, knowledgeable and experienced in the field of securities, and that their claims for rescission were, in any event, barred by laches and waiver. In determining the outcome of this case on appeal, this Court must review each of these findings.

## I. *DID THE JOINT VENTURE INTERESTS PURCHASED BY APPELLANTS CONSTITUTE SECURITIES WITHIN THE MEANING OF THE ARKANSAS SECURITIES ACT?*

The term "security" is defined in the Arkansas Securities Act, Ark. Stat. Ann. § 67-1247(1), (Repl. 1966) as:

> " 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; variable annuity contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security' or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 'Security' does not include any insurance or endowment policy or annuity contract or variable annuity contract issued by any insurance company."

The Appellants' contention is that the joint venture interest which they purchase constituted an "investment contract" or a "certificate of interest or participation in a profit-sharing agreement" within the definition quoted above.

This Court recognizes that regardless of labels, the Arkansas Securities Act was designed to protect both investors in common stock and those persons who in substance are the investors in the disguised business venture of another. This investor protection is accomplished through the definition of security. The definition should be flexible enough to encompass the endless succession of new and innovative or old and tried promotional schemes, where the promoters, by design, seek to risk the money or property of others in their venture. Recent stock market trends, coupled with the existing income tax structure, and other elements, including inflation, have had a material effect on the attitude of Arkansas citizens as to where to place their investment capital. As is graphically illustrated in the facts of the case before us, tax consequences of any investment have become, in the eyes of many, the predominant factor for gauging the success or failure of any venture. Investment schemes are now promoted perhaps more on what the tax losses to be generated by an investment will be rather than the income derived from the investment. It is paradoxical that because of the income tax structure, an investment which generates profit can be a bad investment, while a venture which generates a substantial paper loss becomes a good investment. With such shifting attitudes, there has been a rise in what initially appear to be new and innovative financing methods, for the creation of "tax sheltered" investments. Co-partnerships with public investors have recently been revitalized as a vehicle of conducting a business venture. The sale of limited partnership units in ventures ranging from oil and gas leases to herds of cattle, has come into vogue. Accordingly, if the Arkansas Securities Act is to protect the citizens of this state, then our definition of what constitutes a security must necessarily depend upon an analysis of all of the factors involved in any given transaction.

The "investment contract" and "certificate of interest or participation in any profit-sharing agreement" security, frequently encompasses those unconventional means used by promoters to finance their ventures. This Court has not previously defined these terms. Arkansas adopted essentially the Uniform Securities Act as the Arkansas Securities Act in 1959, Ark. Stat. Ann. § 67-1235, (Repl. 1966) *et seq.* Thirty-

three other states have likewise adopted, in essence, the Uniform Securities Act. The Arkansas Securities Act of 1959 is remedial, and remedial legislation should be liberally construed. *Chicago Mill & Lumber Co. v. Smith,* 228 Ark. 876, 310 S.W. 2d 803 (1958).

The federal view of what constitutes an investment contract was first cited by the United States Supreme Court in *Securities and Exchange Commission v. C. M. Joiner Leasing Corporation,* 320 U.S. 344, 64 S. Ct. 120, 88 L. Ed. 88 (1943). There the promoters engaged in a campaign to sell assignments of oil leases covering some 4,700 acres. Leasehold subdivisions offered never exceeded 28 acres, and all buyers were given an opportunity to pay for their leasehold interest in installments. The driller agreed to drill a test well, financed primarily from the resale to the public of small parcels of lease acreage. The United States Supreme Court held that this scheme did not constitute simply sales and assignments of legal and legitimate oil and gas leases, which were only sales of interests in land. The Court noted that it was an economic interest in the well-drilling undertaking that produced the instruments that the promoters were selling, and gave to them most of their value and all of their lure. In reversing the case, the Supreme Court of the United States stated:

> "Nor can we agree with the court below that defendants' offerings were beyond the scope of the Act because they offered leases and assignments which under Texas law conveyed interests in real estate. In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. *The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as that it is not inappropriate that promoters' offerings be judged as being what they were represented to be.* [Emphasis added]."

The next United States Supreme Court case defining an unconventional security as an investment contract, evolved from *Securities and Exchange Commission v. Howey Co.,* 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946). In that case the

promoter owned large tracts of citrus acreage in Florida. The prospective customer was offered both a land sales contract and a service contract, after having been told that it was not feasible for the prospective customer to invest in a grove unless service arrangements were made. The purchases were usually made in narrow strips of land, so that an acre consisted of one row of 48 trees. The service contract was generally of a ten year duration, without the option of cancellation, and gave the service company full and complete possession of the acreage, with full direction over what crops to plant, etc. In the finding of the term "investment contract" in the *Howey* case, the United States Supreme Court said:

> ". . . an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. . . . "

In the years following *Howey,* some courts have placed a literal emphasis on the *Howey* formula, while others recognized the remedial purpose of the Federal Securities Laws, and refused to give a mechanical value to *Howey.* For example, the Ninth Circuit Court of Appeals, in *SEC* v. *Glenn W. Turner Enterprises, Inc.,* 474 F. 2d 476 (9th Cir. 1973), found an investment contract to exist even though the investors were contributing some effort in a pyramiding investment program.

### The Hawaiian View

Hawaii, like Arkansas, has adopted the Uniform Securities Act. In *State of Hawaii* v. *Hawaii Market Center, Inc.,* 52 Hawaii 642, 485 P. 2d 105 (1971), the Supreme Court of Hawaii was called upon to define the term "investment contract". In so doing, the Hawaiian court went further than the United States Supreme Court in interpreting its Act, as follows:

> "The salient feature of securities sales is the public

solicitation of venture capital to be used in a business enterprise. . . . This subjection of the investor's money to the risks of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction. . . . Any formula which purports to guide courts in determining whether a security exists should recognize this essential reality and be broad enough to fulfill the remedial purposes of the Securities Act. Those purposes are (1) to prevent fraud, and (2) to protect the public against the imposition of unsubstantial schemes by regulating the transactions by which promoters go to the public for risk capital. HRS § 485-10(3). Therefore, we hold that for the purposes of the Hawaii Uniform Securities Act (Modified) an investment contract is created whenever:

"(1) An offeree furnishes initial value to an offeror, and

"(2) a portion of this initial value is subjected to the risks of the enterprise, and

"(3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

"(4) the offeree does not receive the right to exercise practical and actual control over the managerial decision of the enterprise.

"The above test provides, we believe, the necessary broad coverage to protect the public from the novel as well as the conventional forms of financing enterprises. Its utility is best demonstrated by its application to the facts in the instant case."

## The Minnesota View

The Supreme Court of Minnesota recently declined to adopt the Federal view set forth in *Howey,* as being exclusive

under its securities laws. See *State of Minnesota* v. *Investors Security Corporation*, 297 Minn. 1,. 209 N.W. 2d 405 (1973). Perhaps the pioneer case of what constitutes an investment contract is set forth in *State* v. *Gopher Tire & Rubber Co.*, 146 Minn. 52, 177 N.W. 937 (1920). There the Minnesota Supreme Court stated:

> "The purpose of the statute is to protect the public against imposition. It is a new form of regulatory law which, in the course of a few years, has swept over 33 states. It has been said that its popular name indicates the evil at which it is aimed, that is, speculative schemes having no more basis than so many feet of blue sky, . . . and that it is intended to put a stop to the sales of shares in visionary oil wells, non-existent gold mines, and other 'get-rich-quick' schemes, calculated to despoil credulous individuals of their savings. It is a proper and needful exercise of the police power of the state and should not be given a narrow construction; for it was the evident purpose of the Legislature to bring within the statute the sale of all securities not specifically exempted."

The Minnesota Court then went on to say:

> "It is better to determine in each instance whether a security is in fact of such a character as fairly to fall within the scope of the statute. . . . "

We agree with the general approach taken by the Minnesota Supreme Court that the definition of a security within the meaning of the Arkansas Securities Act should not be given a narrow construction, and that it is better to determine in each instance from a review of all of the facts, whether an investment scheme or plan constitutes an investment contract, or a certificate of interest or participation in a profit-sharing agreement, within the scope of the statute.

In applying these principles to the facts in the case at bar, we are convinced that the so-called joint venture interests purchased by the Appellants constituted securities within the meaning of the Arkansas Securities Act. This transaction simply cannot be characterized as the sale of an interest in

real estate. The entire scheme for marketing and managing the apartment complex was put together in one single package by Rector-Phillips-Morse. That corporation and its affiliates organized, constructed, managed and controlled the properties of the joint venture. The "units" were sold to investors as a "tax shelter" and upon the basis that the entire project would be constructed, managed and controlled by Rector-Phillips-Morse or its affiliated companies. However, the risk of loss of money actually invested was placed squarely on the investors, not only for their capital contributions, but also for any additional cash that would be required to make the payments to keep the property from going into foreclosure. In no sense was this a partnership in which a number of persons expected to pool their talents and capital and reap the benefits from their own expertise and abilities. The Stuttgart 221 investors were mere passive contributors of risk capital who placed their money in an investment program labeled a "joint venture". However, the wording of the Trust Agreement and the Joint Venture Agreement, set forth a clear wall of difference between the promoters and the investors.

Legal scholars whose expertise is in security matters have opined that certain general partnership and joint venture units may be securities. See 1 LOSS, SECURITIES REGULATIONS 503-506 (2d ed. 1961); Soward, Fed. Sec. Act in 11 BUSINESS ORGANIZATIONS-SECURITIES REGULATION § 2.01 [12] (1971), and Long, Partnership, Limited Partnership, and Joint Venture Interests as Securities, 37 Mo. L. Rev. 581 (1972).

By this holding, we hasten to add that by no means are all general partnerships or joint venture units securities within the meaning of the Arkansas Securities Act. It is not the label that determines whether these units are securities, but the economic substance of the financing of the venture. Here, Rector-Phillips-Morse put the entire transaction together in a package. That package included the FHA commitment, the land, the construction of the apartments, the management of the apartments, the collecting of the rent, the making of the payment, and even granting to the trustee the authority to sell the entire complex. The investors were strict-

ly passive investors who were buying an interest in a tax shelter with apparently a long-term hope of realizing capital gains on their investments. In short, when the transaction is examined as a whole, it constitutes the sale of securities within the meaning of the Arkansas Securities Act.

## II. *DID THE SECURITIES QUALIFY FOR AN EXEMPTION FROM REGISTRATION PURSUANT TO THE ARKANSAS SECURITIES ACT?*

Section 7 of the Arkansas Securities Act, Ark. Stat. Ann. § 67-1241 (Repl. 1966) provides that it is unlawful for any person to offer or sell any security in this state unless (1) it is registered under the Act, or (2) the security or transaction is exempted pursuant to Section 14 of the Act, Ark. Stat. Ann. § 67-1248 (Supp. 1975). It is admitted by all concerned that the Stuttgart 221 joint venture investment program was not registered under the Act, and it is likewise admitted that the Appellees did not file for an exemption from registration as required by Section 14(f), Ark. Stat. Ann. § 67-1248(f) (Supp. 1975).

The Appellees contend that the transactions involving the Stuttgart 221 units were exempt from registration requirements as being one involving a private offering. Ark. Stat. Ann. § 67-1248(b)(9) describes this exemption as follows:

> "(9) any transaction pursuant to an offer directed by the offeror to not more than twenty-five (25) persons (other than those designated in paragraph (8) of this State during any period of twelve (12) consecutive months, whether or not the offeror or any of the offerees is then present in this State, if (A) the seller reasonably believes that all the buyers in this State are purchasing for investment, and (B) no commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this State; . . . "

Ark. Stat. Ann. § 67-1248(f) provides:

> "(f) Before any transaction shall be executed as an

exempted transaction under Section 14(b)(9), (10) or (11) a proof of exemption must be filed with the Commissioner. The proof of exemption shall contain a statement of the grounds upon which the exemption is claimed and a declaration of which subsection of Section 14 [this section] the exemption is claimed under. For every such proof of exemption filed with the Commissioner there shall be paid to the Commissioner a filing fee of ten dollars ($10.00)."

As heretofore stated, no proof of exemption was filed by Rector-Phillips-Morse, and therefore, the Appellees rely upon Rule 8(f)(3) of the Securities Commissioner of the State of Arkansas, effective September 1, 1972, which provides:

"The filing requirements of Section 14(f) [§ 67-1248(f)] are not applicable where five persons or less form a corporation or limited partnership, or enter into a trust agreement and receive the securities which are issued pursuant to the incorporation, where the requirements of Section 14(b)(9) are otherwise complied with."

If this Rule is to apply here, the Appellees must first prove that they did not receive any commission or other remuneration for soliciting prospective buyers of the joint venture units which we have determined to be securities. Admittedly, Rector-Phillips-Morse put together the package which comprised the Stuttgart 221 project. It then contacted individuals by means of the "confidential information" and solicited the purchase by those individuals of units in this project. In the "confidential information" it was stated that Rector-Phillips-Morse intended to receive a profit of approximately $48,000.00. Because of cost overruns, it appears that the actual amount received was approximately $28,-000.00. This includes a fee in the sum of $20,306.00 for "consulting services" received from the proceeds of the joint venture units sold to the investors. In addition, provisions were made for an additional payment of $100.00 per year for "consulting relationship". It was admitted that $20,000.00 of the "consulting" fee was paid when liquid assets in the form of payment for these "units" first became available.

Upon the showing of a sale of a security, the burden of proof shifts to the seller to show that the security was either registered, or was not required to be registered under the terms of the Arkansas Securities Act. A necessary ingredient in this showing is that no commission was paid, either directly or indirectly, for the solicitation for the sale of the security. We find from the evidence that the Appellees have not met this burden. Indeed, the record is silent as to whether or not any employees of Rector-Phillips-Morse actually received commissions based solely upon the sale of these joint venture units, but the record is clear that Rector-Phillips-Morse itself did receive over $20,000.00 in cash for "consulting fees". When all of the evidence is viewed even in a light most favorable to the Appellees, we cannot escape the conclusion that Rector-Phillips-Morse did, in fact, receive remuneration, both direct and indirect, for the solicitation and sale of the joint venture units. Therefore, the Appellees' contention that the securities were exempt from registration pursuant to Rule 8(f)(3) of the Arkansas Securities Commissioner must fail.

Because of the finding that such remuneration was paid, the question of whether or not more than five persons received securities becomes moot. Moreover, in this connection we would note that Rule 8(f)(3) is designed to permit the formation of small numbers of investors into their own designed business venture, such as a family store, without the filing of other documents to perfect an exemption under the Arkansas Securities Act. Rule 8(f)(3) was not designed for use by a promoter to create a venture in which the promoter was to receive direct or indirect commissions, fees, or other remunerations in connection with the organization, development and operation of the enterprise.

III. *WERE THE KNOWLEDGE AND BACKGROUND OF THE APPELLANTS AND THEIR ACTIONS AND INACTIONS SUFFICIENT TO CONSTITUTE LACHES, WAIVER OR ESTOPPEL SO AS TO BAR THEIR RIGHT OF RESCISSION?*

The Appellants are knowledgeable, experienced businessmen, and are registered stock brokers. Both are college graduates, and have maintained personal investments

in securities of up to $100,000.00. The Appellees did not contact the Appellants to sell them joint venture interests in the Stuttgart 221 project. Rather, both were seeking "income tax shelters" and upon hearing of this project, they took the initiative and contacted the Appellees. The Appellants do not seek rescission of the purchase based upon any fraud or misrepresentations. In fact, they candidly admit that the project is doing extremely well. Their primary reason for seeking rescission is apparently that the Internal Revenue Service has not granted them the income tax deductions which they claimed. However, the Appellants have taken personal tax deductions during the years they have owned an interest in this project, in an amount in excess of their capital contribution. After enjoying the benefits of such income tax deductions, they now seek a court of equity to refund their purchase price and pay them interest and attorneys' fees, not because of any fraud or misrepresentation, but rather because of noncompliance with technical registration requirements. In *Lane v. Midwest Bank Shares Corp.*, 337 F. Supp. 1200 (E.D. Ark. 1972) District Judge, and now Circuit Judge, Henley held that the sophistication and relative knowledge of the buyer were relevant considerations in determining his reliance upon representations. Judge Henley found it difficult, even unrealistic, to apply conventional "blue sky laws" concepts to the aggressive investor in the *Lane* litigation. He concluded the Federal Rule 10b-5 and the Arkansas Securities Act should not be applied to rescue the buyer from the results of his own improvidence. Security laws are aimed at qualifying "the doctrine of *caveat emptor* — not to establish a scheme of investors' insurance." *List v. Fashion Park, Inc.*, 340 F. 2d 457, 463 (2nd Cir. 1965).

Certainly it is not the intention of the Arkansas Securities Act to grant knowledgeable buyers of securities an undue advantage over sellers who are substantially less informed in the field. It was never intended that the securities laws be used as a tool of sophisticated investors to invest in projects or promotional schemes and reap the tax benefits accruing from such ownership, and then have the option several years later to determine whether they want to retain the investment or get their money back with interest while presumably retaining the tax benefits.

Likewise, a party to a contract for the purchase of stock may, of course, be barred from maintenance of an action for rescission by laches, unless he acts promptly to repudiate the contract within a reasonable time after discovery of the facts entitling him to rescind. 12A FLETCHER CYC. CORP § 5610.

When a statute of limitations applies to equitable as well as legal actions, it is clear that laches may still bar a plaintiff in equity before the expiration of the state statute — at least where the state statute does not provide otherwise — and perhaps (since laches is a matter of equity jurisprudence) even when it does. III LOSS, SECURITIES REGULATIONS 1777.

Here the Appellants purchased their interest in November of 1972. At the time of the purchase, the Appellant Schultz considered that the interest he was purchasing could be subject to securities registration requirements, but did not discuss this with the seller. No one ever represented to the Appellants either personally or in the "confidential information" that the interests were securities, either registered or exempt from registration. In fact, according to the testimony of the Appellees' officers, the possibility that the interests which they were selling might be securities or might need to be registered had not occurred to them. Each of the Appellants deducted a total of $30,000.00 on their 1972 and 1973 personal income tax returns. Even after suit was filed in January 1975, the Appellants reported an additional tax deduction of $21,400.00 on each of their 1974 returns. Likewise, *after* the filing of the suit, they each accepted $3,-100.00 in income from the project during 1975.

In applying the doctrine of laches, delay is measured from date of constructive knowledge, not just actual knowledge of the facts entitling the plaintiffs to bring suit. It is well settled that when the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known to him were such as to put the duty of inquiry upon a man of ordinary intelligence. *Johnston* v. *Standard Mining Co.*, 148 U.S. 360, 13 S. Ct. 585, 37 L. Ed. 480 (1897); *Smith* v. *Olin In-*

*dustries, Inc.*, 224 Ark. 606, 612, 275 S.W. 2d 439 (1955). If this doctrine falls upon men of ordinary intelligence, it certainly would apply *a fortiori* in this situation, where two well-educated and highly experienced and knowledgeable stock brokers are concerned. A simple inquiry to Rector-Phillips-Morse would have revealed this information at the time of the sale in 1972.

The delay of the Appellants in bringing this matter to the attention of the Appellees, worked to the prejudice of the Appellees, not only in that had it been brought to their attention *before* the sale, then for a payment of a $10.00 filing fee an exemption presumably could have been obtained, but also prejudiced the present marketability of the Schultz and Watkins interest. In "tax shelter investments" the attractiveness of the investment is based in large measure upon the front-end tax deductions which can be taken during the first few years after construction. These front-end deductions of over $100,000.00 for the interests owned by the Appellants have now been exhausted.

When all of these factors are considered, we agree with the Chancellor below that the conduct of the Appellants, particularly in light of their training and experience, did not constitute the exercise of good faith and reasonable diligence, and that based upon the doctrines of laches and estoppel the doors of the equity court were justifiably closed to them.

In making this finding of estoppel and laches, we are not in any way opening the door to schemes of promoters of unregistered and non-exempt securities whereby they can trap investors into waiving their rights by receiving dividends or taking tax benefits from their investments. Rather, it should be emphasized that these findings are made solely on the basis of the particular circumstances presented by this case.

The judgment of the Chancery Court is affirmed.

GEORGE ROSE SMITH and BYRD, JJ., dissent.

FOGLEMAN, J., not participating.

CONLEY BYRD, Justice, dissenting. I would reverse the

judgment.

The civil liability contained in the Arkansas Securities Act, Ark. Stat. Ann. § 67-1256 (Repl. 1966), provides:

"(a) Any person who (1) offers or sells a security in violation of Section 3, 7, or 17(b), or of any rule or order under Section 15 which requires the affirmative approval of sales literature before it is used, or of any condition imposed under Section 10(d), 11(g), or 11(h) . . . is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent [6%] per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security . . . ."

The record shows, and the proof is not controverted, that appellants did not receive the income tax deductions represented to them in the prospectus that appellees put out. The record also shows that appellants were not versed in real estate investments and that this information was conveyed to appellees, who were experts in real estate investments. The record also shows that appellants ceased their inquiries into the legal and business ramifications of the tax shelters after appellees told appellants that the law firm of Smith, Williams, Friday and Bowen would handle the legal work and Russell Brown and Company would handle the accounting. The same law firm and accounting firm also handled the legal work and accounting work for appellants' employer, Stephens, Inc. The record also shows that appellants did not know that the Trust Agreement had not been registered with the Securities Commissioner until August of 1974. Appellants in October, 1974 had a formal meeting with appellees, with counsel present, and demanded a return of their money. This suit was commenced in January, 1975.

Appellants, as registered security dealers under the Arkansas Securities Act, are now in the peculiar position of having to eat and devour their investment. The Arkansas Security Act prohibits appellants from selling or assigning the security for value. A violation thereof is a felony and in

addition would result in the revocation of their security license. Consequently, appellants, each with an investment of $47,000 in the Trust Agreement, cannot even pledge their interests to a bank for security. Yet appellees who violated the Arkansas Securities Act are permitted to enjoy the fees and profits received from their violation of the law.

Thus the majority permits appellees to enjoy the fruits of their illegal gains while telling the appellants that as registered and experienced security dealers they have no protection under the Arkansas Securities Act. Of course, as I have pointed out, the Securities Act applies alike to everyone who violates it, however, this Court has decided to make an exception in this case. In doing so the majority ignores the fact that the tax shelter did not live up to the prospectus by which the securities were sold.

For the reasons stated, I respectfully dissent.