## Robert E. CASALI *v.* Glenn R. SCHULTZ and J.A. McENTIRE, III

87-29                                               732 S.W.2d 836

### Supreme Court of Arkansas
Opinion delivered July 6, 1987
[Rehearing denied September 14, 1987.*]

* Hickman, J., would grant rehearing.

*Davidson Law Firm, Ltd.,* by *Charles Darwin Davidson* and *Geoffrey B. Treece,* for appellant.

*Ralph Cloar, Jr.* and *Hilburn, Bethune, Calhoon, Harper & Pruniski, Ltd.,* for appellees.

ROBERT H. DUDLEY, Justice. The sole issue in this case is whether the sale of a unit in a partnership constituted the sale of a security within the meaning of the Arkansas Securities Act. We hold that the transaction constituted the sale of a security.

One of the appellees, Glenn R. Schultz, wanted to purchase an investment banking firm. His extensive financial background included a bachelor's degree from Harvard University with majors in economics and banking, a law degree from Chicago Kent College of Law, experience with R. Roland, a New York Stock Exchange firm, and positions as head of the bond operation for Continental National Bank of Chicago for 10 years, and Senior Vice-President in charge of the bond department of Stephens, Inc. of Little Rock for 10 years. In 1981, he approached the other appellee, J.A. McEntire, III, a Little Rock banker, about raising the money to purchase an investment banking firm. McEntire apparently thought Schultz's idea was a sound one as he said he knew some medical doctors who were potential investors. A number of doctors, including appellant Robert Casali, were contacted. Ultimately, eight doctors, an art dealer, and appellees contributed $1,175,000.00 into a partnership which was to purchase an investment banking house. They entered into an agreement captioned, "KGS Partners Partnership Agreement." The stated purpose of the agreement was to own the controlling interest in investment banking houses and to own other real and personal property. The partnership purchased all of the stock of a New York investment banking firm, Park, Ryan & Co. and also a minority of the outstanding stock in a real estate investment company, Greenbelt Properties. The partnership had a later offering of units and appellant Casali invested more money. All together, this second solicitation raised an additional $875,000.00.

Ultimately, Park, Ryan & Co. went into bankruptcy and the partnership was liquidated. Appellant Casali filed this action

alleging that the sale of the partnership units amounted to the sale of securities and that appellees Schultz and McEntire had neither registered nor asked for exemption of the securities, and therefore, the transaction must be rescinded. *See* Ark. Stat. Ann. § 67-1256(a) (Repl. 1980), and *Graham* v. *Kane*, 264 Ark. 949, 576 S.W.2d 711 (1979). The trial court did not make a finding of fact, but ruled that, as a matter of law, the transaction was not a security. We reverse.

The only business of the partnership was a passive investment in the corporate stocks of Park, Ryan & Co. and Greenbelt Properties. As a practical matter, the partners had no business to run since all they could do was vote the common stock of Park, Ryan & Co., and they could not even vote to sell that stock without appellees' consent since the partnership agreement provided that it took unanimous agreement of all partners to sell any of the assets of the partnership.

Appellant and the other investors did not have any control over the operations of Park, Ryan & Co. Appellee Schultz's testimony on that issue is fairly abstracted as follows:

> The investors did not have the right to hire employees of Park Ryan. The investors did not have the right to fire the employees of Park Ryan. The investors did not have the right to trade securities for Park Ryan. The investors did not have the authority to buy securities for Park Ryan. The investors did not have the authority to sell securities for Park Ryan. The investors did not have the authority to set salaries for Park Ryan. The investors did not have the authority to mortgage property of Park Ryan. The investors did not have the authority to open bank accounts. The investors did not have the authority to sign checks. The investors did not have the right to incur any debts. The investors did not have any rights to sell any assets. The investors did not have the individual right to say how the stock of Park Ryan would be voted. The only thing that they had a right to do was to vote the partnership interest.

Appellee Schultz alone among the investors had the knowledge, experience, and expertise necessary to operate an investment banking house. In fact, appellant Casali did not have any training in business or management and had never traded in

securities. His only other investment was in an 80 acre farm.

The term "security" as defined in Ark. Stat. Ann. § 67-1247(1) (Repl. 1980) includes "investment contracts" and "certificate of interest or participation in any profit-sharing agreement." In *Schultz* v. *Rector-Phillips-Morse*, 261 Ark. 769, 552 S.W.2d 4 (1977), we decided to adopt a flexible concept for the term "security" since the act is remedial and should be liberally construed to afford protection to the public. Further, the legislative intent was that, regardless of the label on a document, the underlying economic substance of a security is an arrangement where the investor is a mere passive contributor of risk capital to a venture in which he has no direct or managerial control. *See* Bell, *Real Estate and Unconventional Securities Concepts Under The Arkansas Securities Act*, 3 UALR L.J. 75 (1980).

The mere fact that an investment takes the form of a general partnership does not insulate it from the reach of the Arkansas Securities Act. In construing the Federal Securities Act of 1933, which is similar to the Arkansas Act, the Fifth Circuit Court of Appeals has written:

> A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson* v. *Tucker*, 645 F.2d 404, 424 (1981).

Here, the first of the above criteria was clearly established by the investor, appellant Casali. Appellant established that appellee Schultz, by his veto power, could assure that the general partnership would always keep its investment in the

investment banking house, and, at the same time, he had absolute control over the investment banking operation. Thus, appellant, in economic reality, was merely a passive contributor of risk capital to appellees' enterprise. Appellant had no control over the risks taken with his investment. "This subjection of the investor's money to risks of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction. . ." *State of Hawaii v. Hawaii Market Center, Inc.,* 52 Hawaii 642, 485 P.2d 105 (1971). The transaction in the case at bar constituted a security transaction.

Reversed.

HICKMAN, HAYS, and GLAZE, JJ., dissent.

TOM GLAZE, Justice, dissenting. This case was tried to the trial court without a jury. To reverse, this court must determine that the trial court erred as a matter of law or its findings were clearly against the preponderance of the evidence. *See* ARCP Rule 52; *see also Taylor* v. *Richardson,* 266 Ark. 447, 585 S.W.2d 934 (1979). In my opinion, this court's holding violates Rule 52.

The single and controlling issue to be decided is whether the interest the appellant (and his other general partners) purchased in KGS Partners constituted a "security transaction." If so, appellant is entitled to pursue his action to rescind the so-called security unit he purchased in KGS since KGS neither registered nor exempted any such security transactions under the Arkansas Securities Act. Of course, if the appellant's interest in KGS Partners was *not* a "security" (as the trial judge so found), the appellant's action against the appellees must fail.

In our earlier case of *Schultz & Watkins* v. *Rector-Phillips-Morse, Inc.,* 261 Ark. 769, 552 S.W.2d 4 (1977), we fully discussed the term "security" and what constitutes one under the provisions of the Arkansas Securities Act. We held that, to determine whether a sale or transaction constitutes a security, we must look to more than how the transaction is labeled. On this point, I agree with the majority opinion where it holds that the underlying substance of a security—as defined in *Schultz*—is an arrangement where the investor is a mere passive contributor of risk capital to a venture in which he has *no* direct or managerial

control. In *Schultz*, we held that certain interests purchased in a joint venture constituted securities, because the investors there were strictly passive investors who were buying an interest in a tax shelter. We hastened to add that by no means are all general partnerships or joint venture units securities within the meaning of the Arkansas Securities Act.

The *Schultz* holding is clearly controlling here, and the only issue is whether the record supports the trial court's decision that the appellant's interests purchased in KGS are *not* securities. As the majority opinion indicates, the underlying and pertinent factual issue is whether the appellant was a passive contributor or investor of risk capital to the KGS partnership. The following summarized testimony supports the trial court's holding that the appellant and his other general partners were active, not passive, investors in KGS.

### Westbrook Testimony

Dr. Kent Westbrook contacted the appellant and other doctors about forming an investment group to be involved in the bond, real estate development and leasing business. *Westbrook's role was one of the three managing partners* and was to keep the other partners informed. Westbrook said that when the *doctors-investors* were initially contacted, they specifically stated they did not want a limited partnership but instead *wanted a general partnership in which everyone had a participation in the management*. Eventually, an advisory committee was formed comprised of five of these general partners, plus Westbrook and both appellees. That committee met on a monthly basis—other general partners were invited and appellee Schultz sent minutes and a newsletter concerning the meetings to the partners. The general partners met and agreed to buy stock in Park, Ryan, Inc., a New York investment banking firm. Most of the board meetings of Park, Ryan, Inc. were held in conjunction with partnership meetings and all partners were notified of the partnership meetings.

### Johnson Testimony

Sam Johnson was a general partner in KGS and attended the first organizational meeting. At that meeting, the attendees-*investors*, by consensus, *agreed* to form a partnership so that *they*

*would be "involved in the management of the partnership* and have a say-so, because a lot of the people voiced that they had been in limited partnerships where they felt they had no control." Johnson said that partnership meetings were held and appellant attended those meetings. KGS's progress and policies were discussed and decisions were made and voted on by the partnership members. All of the partners participated in the decision to purchase Park, Ryan, Inc. and to invest in Greenbelt Properties.

### Price Testimony

Charles Price said that his law firm was employed to assist in the acquisition of the stock in the broker-dealer firm, Park, Ryan, Inc. He attended the first organizational meeting when the investors said they did not want a limited partnership because "they wanted to have a voice in how the operation ran." Price expressed his opinion that the partnership interest in KGS would not be a security. He related that the KGS partnership agreement "specifically says that each of the partners will have a voice in the partnership."* He said the partners had control over Park, Ryan, Inc. through their voting control of KGS.

*NOTE: Price referred to the KGS Partners Partnership Agreement, which reflects the partners' initial interests in the partnership were:

| | |
|---|---|
| Schultz | 12.8% |
| Westbrook | 8.5% |
| McEntire | 4.3% |
| Other partners | 74.4% |

### Downing Testimony

Richard Downing, appellant's witness and attorney specializing in securities law, offered an opinion that the KGS partnership interest was a security, but conceded that the general partners could have removed the appellees "without either [appellee] voting on it." On cross-examination, Downing conceded that, if it could be established that the partners in KGS attended partnership meetings held in conjunction with director meetings of Park, Ryan, Inc. and those partners participated in the meetings, those facts—with some additional factors—would change his mind when determining whether a passive investor had become an active one.

## McEntire and Schultz Testimonies

J.A. McEntire, III said that the partners participated in the partnership and that Dr. Westbrook came to the offices at least once a week and reported back to all the investors-partners. He stated the partners, through monthly partnership meetings and board of directors meetings, were kept advised. McEntire testified he received an oral legal opinion that the partnership interest in KGS was not a security, and understood no need existed for filing anything with the securities department.

Glenn Schultz related that he and McEntire were involved in the day-to-day management of Park, Ryan, Inc., but were getting overall direction from the partners. The doctors, he said, were to give direction as to the management of the firm. He said he had been legally advised that the KGS partnership interests were not securities.

The trial court, relying upon evidence such as that set out above, could have readily and reasonably inferred that the appellant and his other general partners retained control of KGS and, in fact, participated in and directed the affairs of that partnership. Dr. Westbrook undisputably was a managing partner, and he served as the other general partners' link to the weekly business affairs of KGS. In addition, the appellant, and other investors-partners like him, actively participated in the decision making of the business at the monthly partnership and board of directors meetings.

Admittedly, the majority has recited testimony which, if believed, could support the decision it reached. That, however, is not our function on review. We should all be able to agree, I think, that it was within the trial court's province to weigh the evidence and to observe and to determine the credibility of the witnesses in this matter. Once done, this court reverses only if the trial court was clearly erroneous in discharging its duty under Rule 52. Given the strong evidence that supports the trial court's decision here, I cannot say it was clearly wrong. This case should be affirmed.

HICKMAN and HAYS, JJ., join in this dissent.