**In the Matter of The HAWAII CORPORATION, Debtor.**

**John T. GOSS, Trustee of the Estate of The Hawaii Corporation, Plaintiff,**

**v.**

**Randolph CROSSLEY, et al., Defendants.**

**Bankruptcy No. 76–0512, Civ. No. 79–0037.**

United States District Court, D. Hawaii.

March 24, 1983.

Loren R. Rothschild, Robert M. Turner, James L. Marable, Fogel, Rothschild, Feldman & Ostrov, Los Angeles, Cal., R. Charles Bocken, Kenneth R. Kupchak, Diane D. Hastert, Damon, Key, Char & Bocken, Honolulu, Hawaii, for plaintiff.

George L.T. Kerr, Paul M. Ganley, Chun, Kerr & Dodd, Honolulu, Hawaii, G. Richard Doty, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., W. Sidney Davis, Jr., Marc J. Schiller, Sharon L. Fishman, Maria A. Fulgieri, Davis, Markel, Dwyer & Edwards, New York City, for defendant Peat, Marwick, Mitchell & Co.

## OPINION AND ORDER

PANNER, District Judge, Sitting by Designation.

### INTRODUCTION

Plaintiff John T. Goss is trustee in the Chapter X Reorganization of The Hawaii Corporation (THC). He seeks to recover damages of approximately $22,000,000 allegedly suffered by THC as a result of accounting work done by defendant Peat, Marwick, Mitchell & Company (PMM) in connection with the reorganization of THC and American Pacific Group (APG).

Plaintiff's original complaint asserted claims against former officers, directors and auditors of THC. As a result of prior proceedings, PMM is the only remaining defendant. All references in this opinion to "defendant" are to PMM.

Plaintiff alleges he is entitled to recover as THC's successor-in-interest for: (1) violations of the federal and State of Hawaii securities laws; (2) professional malpractice and negligence; (3) breach of contract; and (4) common law fraud.

On July 21, 1982, United States District Judge Martin Pence granted plaintiff's motion for summary judgment on defendant PMM's amended counterclaim. The parties then filed cross motions for summary judgment on the remaining issues. I reserved ruling on the motions until trial because of

the age of the case, its complexity and the fact that an imminent trial date had been set when I was assigned the case. At the end of the trial, I took the matter under advisement. I DENY the cross motions for summary judgment and find for the defendant.

## BACKGROUND

The Von Hamm-Young Company was incorporated in 1899. It developed from a family-owned business into one of Hawaii's larger corporations. By 1964, when the company changed its name to "The Hawaii Corporation," it was active in construction, merchandising, real estate, laundry, and consumer finance services. THC's revenues grew from approximately $49 million in 1965 to $87 million in 1971. Retained earnings increased during this period from $2.7 million to $8.6 million. It had a long history of uninterrupted quarterly dividends to shareholders. However, by the late 1960s, the officers, directors and financial associates of THC became concerned about its future and began planning for external expansion through acquisitions and mergers.

American Pacific Group was formed in 1959 as Hawaii National Insurance Company. It was primarily a holding company whose subsidiaries, other than THC, were for the most part unprofitable and unseasoned enterprises.

Peat, Marwick, Mitchell & Co. is a partnership engaged in the practice of public accounting. PMM's Honolulu office served as the accountants for APG and THC during the reorganization and until approximately one year afterwards. PMM's Los Angeles office served as the accountants for Falcon Capital Corporation (FCC), a subsidiary of APG until THC acquired FCC in September, 1972.

In May 1967, APG acquired 39% of the THC stock and by February 1968, controlled approximately 50.5% of THC's stock. By 1969, APG had nominated five of the seven THC directors. By August 1970, APG owned approximately 54% of THC's outstanding capital stock. Randolph Crossley was president of APG from 1966 to 1969 and in April 1969, he became president of THC.

APG had, as its goal, consolidation with THC. During 1968–69, THC and APG management representatives and directors discussed the possibility of a merger of the two companies. In November 1970, Crossley stated publicly that APG intended to pursue a merger with THC, after which the survivor would seek a listing on the New York Stock Exchange.

From November 1970 until March 3, 1972, when the reorganization was concluded, the THC and APG Boards of Directors discussed the desirability and the terms of their agreement. Both Boards were composed of experienced, capable businessmen who reviewed extensive evaluations and financial information.

In November of 1970, the THC Board requested that PMM provide pro forma financial statements reflecting the reorganization of APG and THC. The Board also asked PMM to express opinions as to the most advantageous means of combining APG and THC and whether or not the transaction should be accounted for by the "pooling of interests" or by the "purchase" method of accounting.

On December 11, 1970, PMM delivered the pro forma statements accounting for the combination on the basis of purchase accounting with THC as the acquiring company and APG as the acquired company. Two investment companies prepared reports for THC and APG with respect to valuations and exchange ratios. THC, APG, and their subsidiaries had their own internal financial personnel who prepared interim financial statements and cash flow projections.

In its June 30, 1971 report to THC, duPont Glore Forgan, THC's investment banker, concluded that although the reorganization was ultimately in the best interests of the stockholders of THC, the advantages at that time were outweighed by the disadvantages. DuPont Glore Forgan recommended that the reorganization be deferred

until APG and THC could satisfy certain conditions.

THC and APG Board members disagreed among themselves as to the validity of the duPont Glore Forgan report. They directed the managements of THC and APG to prepare further reports and analyses for review by the Bank of America and presentation to the boards. The Bank recommended the reorganization. On August 20, 1971, the THC directors approved the merger of THC and APG, with an exchange ratio to be negotiated by a committee of directors from both companies.

The plan of reorganization was executed on September 22, 1971. It provided that APG would transfer its assets and liabilities, including 926,000 shares of THC stock, to THC. THC would then transfer back 818,963 shares of THC stock to APG. APG would then distribute the 818,963 THC shares to its stockholders on the basis of one THC share for each 2.65 APG shares. APG would then dissolve. Before the reorganization, APG as a corporation owned approximately 55% of THC's common stock. After the reorganization, the former APG shareholders owned approximately 52.7% of THC's stock.

A condition precedent to the reorganization was a comfort letter from PMM stating that, on the basis of a limited review, nothing had come to PMM's attention which caused it to believe that there had been any material adverse changes in the consolidated financial position or results of operations of APG or its subsidiaries.

After an exchange of correspondence among APG, PMM, and the SEC about the method of accounting for the transaction, the SEC by inaction permitted the filing of the proxy statement with the plan of reorganization and the attached materials including pro forma financial statements.

## PLAINTIFF'S CONTENTIONS

Plaintiff contends that defendant acted negligently and recklessly in performing the accounting services for THC in connection with the reorganization and the subsequent accounting treatment of certain corporate transactions. He alleges that defendant did not comply with Generally Accepted Accounting Principles and Generally Accepted Auditing Standards as follows:

(1) In failing to apply purchase accounting to the reorganization with APG as the acquirer and THC as the acquired.

(2) In issuing the comfort letter as it did in spite of APG's alleged material adverse changes in financial position or results of operation from June 30, 1971 to February 29, 1972 (the comfort period).

(3) In failing to revise the accounting for the APL–FCC Continental sale of insurance transaction as recorded by the companies involved.

(4) In treating the net operating loss carryforward of APG as a current asset on the combined balance sheet after the reorganization.

(5) In failing to revise the accounting for amortization of the New Ventures, Ltd. (an APG subsidiary) cost in excess of net book value.

Plaintiff alleges this conduct violated federal and State of Hawaii securities laws and constituted negligence, breach of contract, and fraud.

## RULE 10b–5 CLAIM

Plaintiff contends that PMM recklessly performed its accounting and auditing services in violation of Section 10(b) of the Securities and Exchange Commission Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Securities and Exchange Commission, 15 C.F.R. § 240.10b–5.[1] There is

---

1. Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, provides in relevant part:
   "It shall be unlawful for any person, . . . .
   . . . .
   "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or

any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

no contention of intentional fraud. Plaintiff asserts that THC was both a purchaser and a seller of securities within the meaning of Rule 10b–5. PMM denies plaintiff's assertion.

Standing to bring a private damage action under Rule 10b–5 is limited to actual "purchasers" or "sellers" of "securities." *Birnbaum v. Newport Steel Corporation*, 193 F.2d 461 (2d Cir.1952); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

A "sale" includes "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3). A "security" is defined as including stocks, bonds and investment contracts. 15 U.S.C. § 77b(1). These broad statutory terms do not include certain instruments if "the context otherwise requires." 15 U.S.C. § 77b. In enacting the securities laws, Congress did not intend to provide a broad federal remedy for all fraud. *See Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982).

The Supreme Court, in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), set forth the analysis for determining whether a sale of "stock" is a sale of "securities" in a given context. In *Forman,* the residents of a cooperative housing project brought a derivative suit under the federal securities laws against their membership corporation, owner, and sales agent, among others. The Court held that shares of stock entitling purchasers to lease an apartment in a cooperative were not "securities" within the meaning of the Securities Acts.

The Court first rejected the suggestion that because it was a sale of "stock," it was necessarily a sale of "securities." The name given to an instrument is relevant, but not dispositive of the question whether it is a security. 421 U.S. at 849–50, 95 S.Ct. at 2059–60. Because Congress intended the securities laws to turn on the economic realities of a transaction, 421 U.S. at 849, 95 S.Ct. at 2059, the court applied a three-prong "economic reality" test to determine whether the shares were, in substance, "securities." 421 U.S. at 851–53, 95 S.Ct. at 2060–61. The three prongs of the test are: (i) an investment in a common venture; (ii) premised on a reasonable expectation of profits; (iii) to be derived from the entrepreneurial or managerial efforts of others. 421 U.S. at 852, 95 S.Ct. at 2060. *See SEC v. W.J. Howey Co.*, 328 U.S. 193, 201, 66 S.Ct. 932, 936, 90 L.Ed. 1165 (1946). The *Forman* court determined that there had been no attempt to attract investors by the prospect of profits from the efforts of third parties. 421 U.S. at 854, 95 S.Ct. at 2061. Finding that the shares in the cooperative were not "securities," the court held that there was no jurisdiction under the Securities Acts. 421 U.S. at 859, 95 S.Ct. at 2064.

Some circuits have applied a literal test to determine whether "stock" was a "security" within the scope of 10b–5. The Second Circuit has held that conventional stock in business corporations is a security within the meaning of the Securities Acts whether or not the underlying transaction involves the sale of a business to one who intends to manage it. *Golden v. Garafalo*, 678 F.2d 1139, 1140 (2d Cir.1982). The Fourth Circuit has held that when a transaction involves stock, there is a strong presumption that the statutes apply. *Coffin v. Polishing Machines, Inc.*, 596 F.2d 1202, 1204 (4th Cir.1979). In *Coffin,* the court determined that *Forman* requires an analysis of the

Rule 10b–5, 17 C.F.R. § 240.10b–5 (1978), provides:
"Employment of manipulative and deceptive devices:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
"(a) To employ any device, scheme or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

substance of the transaction only when the stocks involved are not typical. *Id.*

Other circuits have applied the economic reality test to determine whether "stock" and other instruments defined in 15 U.S.C. § 77b(1) are "securities" within the scope of 10b–5. In *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), one corporation purchased the stock and assets of another corporation. Rejecting the argument that because the purchase of stock fell within the literal wording of the federal securities laws, a legal presumption would arise that a security was sold, 637 F.2d at 1150, the court applied the "economic reality" analysis used in *Forman:*

> Not all sales transactions which involve "stock" are necessarily covered by the securities laws. Rather, the test of coverage, in general is whether the purchaser is placing money in the hands of another who will control the funds and the business decisions. If, however, the purchaser is assuming control of the critical decisions of the corporation, then the transaction is not considered to involve "securities." Here, we find that the purchaser took control of the corporation. Therefore, this situation does not involve a "security" within the meaning of the federal securities laws."

637 F.2d at 1148.

The Tenth Circuit has held that the purchase of a business which included the receipt of 100% of the stock of the company owning the business did not involve the sale of a "security." The transfer of shares of stock which are merely "indicia of ownership" are not subject to the federal securities laws. *Chandler v. Kew, Inc., et al.,* 691 F.2d 443, [1979] Fed.Sec.L.Repr. (CCH) ¶ 96,966, at 96,054 (10th Cir.1977).

In *Anchor-Darling Industries, Inc. v. Suozzo,* 510 F.Supp. 659 (E.D.Pa.1981), the purchaser of the controlling stock of three closely held corporations alleged that a shareholder knowingly made false representations in an agreement of sale. The court applied the *Forman* three-prong economic reality test and found that the plaintiff failed to meet the first and third elements: Anchor-Darling made no investment in a common enterprise and was not receiving profits from the efforts of others. 510 F.Supp. at 662–63. "[T]he reality of the transaction here was the sale of a business negotiated at arms length by knowledgeable persons." 510 F.Supp. at 666.

In the Ninth Circuit, a bank brought action against a thrift company to recover for an alleged breach of agreement to purchase promissory notes given to secure advances under lines of credit. *United California Bank v. THC Financial Corp.,* 557 F.2d 1351 (9th Cir.1977). The issue was whether an agreement to purchase all notes for a period of time constituted a "security" within the meaning of the federal securities laws. The court applied the *Forman* economic reality test:

> [T]he conclusion is inescapable that [THCF] was a sophisticated financial enterprise. THCF decided after completing its own credit investigation to enter into a commercial lending arrangement which it thought was relatively risk free and, in the light of hindsight, was not. An error in business judgment rather than a lack of disclosure by UCB better explains THCF's predicament .... [T]he fact "that this [transaction] proved to be unduly risky and ill-advised does not in itself convert it into a speculative investment."

557 F.2d at 1359 (citations omitted).

In *United Sportfishers v. Buffo,* 597 F.2d 658 (9th Cir.1978), the issue was whether the notes and land-sales contract given as consideration in connection with the sale of two vessels were "securities" within the meaning of the federal securities laws. The court applied the *Forman* three-prong economic reality test and decided the notes and contract were not securities because there was no investment with the hope of securing the promised return through growth of an enterprise resulting from the use of investors' funds. The court refused to apply the federal securities laws to non-investment commercial dealings. 597 F.2d at 660–61.

The shares of stock of APG and THC were "securities" in the literal sense. Analysis of the peculiar facts of the case and the substance of the transactions make it clear that the shares of stock of those corporations do not constitute "securities" within the meaning of Rule 10b–5.

The transactions giving rise to this suit involved the purchase of several businesses. THC was a sophisticated buyer. Its board was composed of knowledgeable people, five of whom were running the companies THC was acquiring. THC had its own personnel, as well as outside experts, evaluating the financial condition of the acquired companies. THC acquired all of APG's assets and, after the purchase, was in complete control. The fact that THC now complains in hindsight that the transaction was ill-advised does not change the economic realities of the transaction.

THC complains, not against the acquired businesses, but against PMM, the CPA firm it employed to evaluate the businesses. PMM made guarded representations about its work, warning THC of its limited review. In the comfort letter, PMM stated:

> It should be understood that this limited review would not necessarily reveal adverse changes in the financial position or results of operations of the companies or inconsistencies in the application of generally accepted accounting principles. Subject to this explanation and based upon the aforementioned limited review, nothing has come to our attention . . . .

Ex. P–201, pp. 2–3.

THC does not allege that PMM was guilty of intentional fraud. I conclude that 10b–5 should not be construed to impose liability on an accounting firm based on alleged errors in the accounting work performed on behalf of the plaintiff under the circumstances of this case.

## HAWAII UNIFORM SECURITIES ACT

Plaintiff also contends that PMM performed its accounting and auditing services in violation of the Hawaii Uniform Securities Act (modified), H.R.S. § 485–25. Defendant denies this allegation.

■ To establish standing to bring suit under the Hawaii Securities Act, the shares involved in the transactions must be "securities." *Cunha v. Ward Foods, Inc.,* 501 F.Supp. 830, 835 (D.Haw.1980). The Supreme Court of Hawaii has devised its own four-part analysis for this determination. *Id.* For the purposes of the state securities laws, an investment contract (a "security") is created when:

(1) an offeree furnishes initial value to an offeror, and

(2) a portion of this initial value is subjected to the risks of the enterprise, and

(3) the furnishing of the initial value is induced by the offeror's promises of representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

(4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

501 F.Supp. at 835–36, quoting *State v. Hawaii Market Center, Inc.,* 52 Haw. 642, 649, 485 P.2d 105, 109 (1971). In introducing this analysis, the *Hawaii Market Center* court referred to the purposes of the Securities Act and explained that the "subjection of the investor's money to the risks of an enterprise over which he exercises no managerial control is the basic *economic reality* of a security transaction." 52 Haw. at 648, 485 P.2d at 109 (emphasis added.)

■ The test, therefore, for standing under the Hawaii Securities Act looks to the economic reality of the transaction. For the same reasons that the transactions involved here did not involve "securities" within the meaning of Rule 10b–5, I conclude that plaintiff lacks standing to pursue the Hawaii Securities Act claims.

If plaintiff is entitled to relief, it must be based on common law fraud or negligence.

## NEGLIGENCE

The charges of negligence relate to events that occurred at different times. The testimony at trial moved from one time period into another, often without demarcation. A number of defendant's personnel were involved in different types of activities for the various companies at different times. Plaintiff's principal complaint is that the reorganization occurred. Plaintiff argues that, if the proper method of accounting had been applied to the transaction and if the financial facts had been made available, either the THC Board or one or more of the minority shareholders of THC would have prevented the reorganization.

The charges of negligence must be evaluated in light of defendant's knowledge on March 2, 1972, the date on which the reorganization was final. This is important, not only in determining whether defendant was negligent, but if so, whether that negligence was a substantial factor in bringing about the reorganization and the ultimate financial disaster to THC. Determination of the causes of actions available to board members and whether or not minority shareholders would have instituted successful minority stockholder's litigation becomes most difficult. This is particularly so when the events occurred over 10 years ago and some of the principal actors are deceased.

Plaintiff alleges negligence in five general areas: (1) in the method of structuring the reorganization, in that defendant failed to apply purchase accounting with APG as the acquirer and THC as the acquired; (2) in defendant's issuance of the comfort letter in spite of changes in the financial position of APG and its subsidiaries during the comfort period; (3) in accounting for the APL–FCC–Continental sale of insurance transaction; (4) in accounting for the net operating loss carryforwards of APG; and (5) in accounting for the amortization of the New Ventures cost in excess of net book value.

Accountants and auditors have the duty to exercise that degree of care, skill and competence exercised by reasonably competent members of their profession under the circumstances. *Franklin Supply Co. v. Tolman,* 454 F.2d 1059, 1065 (9th Cir. 1972). An accountant is not a guarantor. His duty is to act honestly, in good faith, and with reasonable care in the discharge of his professional obligations. *SEC v. Arthur Young & Co.,* 590 F.2d 785, 788 (9th Cir. 1979).

Generally, an accountant or auditor discharges his professional obligations by complying with industry standards, Generally Accepted Accounting Principles (GAAP) and Generally Accepted Auditing Standards (GAAS). *See, e.g., Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs,* 455 F.2d 847 (4th Cir.1972); *SEC v. Arthur Young,* 590 F.2d at 788–89. Compliance with GAAP and GAAS, however, will not immunize an accountant when he consciously chooses not to disclose on a financial statement a known material fact. *SEC v. Arthur Young,* 590 F.2d at 289; *United States v. Simon,* 425 F.2d 796 (2d Cir.), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970).

An accountant or auditor breaches his professional obligations if, in performing his services, he makes negligent misrepresentations. The standard of liability for negligent misrepresentation is set forth in Section 552 of the Restatement of Torts, Second:

§ 552  Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them for their justifiable reliance upon the information, if he failed to exercise reasonable care or competence in obtaining or communicating the information.

The Supreme Court of Hawaii adopted the Restatement definition in *Chun v. Park,* 51 Haw. 462, 467–68, 462 P.2d 905, 907–08

(1969), in determining the liability to a buyer of a title company making a title search.

### 1. *Method Of Structuring The Reorganization.*

■ The American Institute of Certified Public Accountants (AICPA) is the national professional organization of certified public accountants. AICPA publishes the *Journal of Accountancy* and during the time relevant to these proceedings, published a series of Accounting Research Bulletins (ARB) and Accounting Principles Board (APB) "opinions." Until 1974, AICPA was the source of authoritative accounting and auditing pronouncements. That role has been assumed by the Financial Accounting Standards Board (FASB) since 1974. The APB was established by AICPA to formulate financial accounting and reporting principles through the issuance of "opinions."

GAAP are those principles recognized as appropriate in the recording, reporting, and disclosing of financial information. AICPA has authorized its staff to issue "interpretations" of accounting questions having general interest to the profession to provide guidance on a timely basis without the formal procedures required for an APB "opinion." These "interpretations" are unofficial and tentative unless confirmed by the board in an "opinion." In addition, the SEC issues reports and maintains the records of previous proxy filings upon which no report is issued. The defendant and similar companies publish manuals to serve as guidelines.

In reorganizations involving two or more companies, there are two methods of accounting—the "purchase" method and the "pooling of interest" method. Under the purchase method, generally the assets of the acquired company are recorded at their purchase price as opposed to their book value or historical cost. The retained earnings of the combined companies immediately after the merger are equal to the retained earnings of the acquiring company and exclude the retained earnings of the acquired company. The income statement reflects the acquiring company's income and disregards the acquired company's income.

When the pooling of interest method is used, the retained earnings of the combined company are computed as if the companies had always been one company and the assets of both companies are recorded at their historical cost. The income statement reflects the combined income of both corporations. The purchase method permits the assets on the balance sheet to be "stepped-up" for income tax purposes. The pooling of interest method does not permit such a step-up.

Defendant accounted for the APG–THC reorganization by the purchase method on the income statement with THC as the acquirer and APG as the acquired. The balance sheet was accounted for by the pooling of interest method. The audited consolidated income statement for March 31, 1972 showed net earnings of $2,541,988. The balance sheet showed retained earnings of $5,730,095 (Ex. P–7).[2]

Plaintiff contends that APB Opinion 16 required that the transaction be accounted for using the purchase method with APG as the acquirer. Plaintiff further contends that had this been done, the resulting combined statements would then have shown negative net earnings on the income statement, negative retained earnings on the balance sheet, and that under those circumstances the reorganization would not have occurred. Defendant contends APB Opinion 16 was not applicable, that the particular circumstances of this transaction called for the exercise of judgment by the accountant, and that defendant exercised proper judgment.

APB Opinion 16 was issued in November of 1970 in an effort to correct accounting problems that had been occurring when a corporation and one or more businesses were brought together into one accounting

---

**2.** The audited figures, of course, were not available at the time of the reorganization though the pro forma financial statements available to directors in considering the merger estimated net earnings as of March 31, 1972 at $2,603,-000.

entity. Through it, the APB expressed its opinion as to the proper methods of accounting in a "business combination." Interpretation of this opinion occupied a significant portion of the testimony of numerous expert witnesses in this case just as it has occupied the attention of accountants in the years since its issue. Plaintiff's experts and defendant's experts are in complete disagreement as to whether or not APB Opinion 16 applied at all, and if so, what it dictated in this particular situation.

Defendant's conduct must be evaluated in light of information and knowledge available to the profession from late 1970 until early 1972, when this reorganization occurred. At that time Opinion 16 was new and confusing to the profession. This confusion is best illustrated by the Arthur Anderson & Co. publication in September, 1971, "Interpretations of APB Opinion Nos. 16 and 17" (Ex. D–956 at p. 3):

> Transactions involving ownership interests of subsidiaries of a holding company or a parent company pose dilemmas in determining appropriate accounting. Paragraph 5 of Opinion No. 16 indicates the Opinion does not apply to a transfer of net assets or exchange of shares between companies under common control. Paragraph 43, on the other hand, concludes that the acquisition of some or all of the stock held by minority stockholders of a subsidiary—whether acquired by the parent, the subsidiary itself, or another affiliate—should be accounted for by the purchase method.
>
> . . . .
>
> Conflicts between paragraphs 5 and 43 of Opinion No. 16 will continue to arise. It appears that purchase accounting is not required in exchanges between companies under common control unless the prior minority interests become shareholders in the parent company or holding

company. The SEC seems to be particularly concerned about purchase accounting when the result is recognition of an excess of book value over fair value of asset conveyed. Each exchange of this nature will continue to require careful review.

Early in the transaction, Frank DePonte, the PMM audit partner for THC through fiscal 1971, in a letter to THC of December 11, 1970 (Ex. P–403), concluded that APB Opinion 16 applied and that the reorganization should be accounted for using purchasing accounting with THC as the survivor. Subsequent correspondence (Ex. P–413) to THC attorneys indicates that he had evaluated APB Opinion 16 and the defendant's Policy Manual of October 19, 1971. His letter to the Securities Exchange Commission of January 14, 1972 (Ex. P–435) gives a thoughtful evaluation of APB Opinion 16. He concluded that Paragraph 43 and the related interpretations were not controlling because:

(1) THC minority shareholders were not acquired in the reorganization;

(2) Existence of common directors precluded treatment as an arms-length transaction;

(3) Minority interests of the THC shareholders remain substantially unchanged.[3]

He concluded that the assets, including the retained earnings on the balance sheet, must be accounted for by the pooling of interest method at historical cost. Paragraph 2 of the letter makes it clear that he evaluated Interpretation No. 26 issued in December, 1971.

The proxy statement filed with the SEC demonstrated the treatment of THC as the acquiring corporation and the relationship of the common directors. It included pro forma statements showing a pooling of the

---

**3.** Plaintiff argues that, in fact, the minority interest was changed because APG had substantial debt, thereby changing the relative risk of the THC minority. The logic of defendant's witness Waterfield's testimony on this subject is persuasive. Every acquisition by a company subjects the shareholders to risks of varying degrees. The debt of APG was fully disclosed,

evaluations were made by other consultants, two law firms were involved, reports were made to the State of Hawaii that the consideration was fair so that the stock issued might be fully paid up, the Board of THC was made up of experienced and knowledgeable business people, and the exchange ratio for the stock was not determined by defendant.

balance sheet with purchase accounting on the income statement. Although it initially questioned the method of accounting for the reorganization, the SEC permitted it to be completed. The experts disagree on the effect of inaction by the SEC. In this particular case, it has significance by virtue of the serious and extensive correspondence over the method of accounting. Testimony of the plaintiff's experts that the accounting profession relies to some extent on inaction is established by the fact that both parties refer to and argue the effect of two other cases of inaction by the SEC.[4]

Interpretation No. 39 issued in March of 1973 (Ex. P–121) indicates that confusion existed in the profession about APB Opinion No. 16 some time after this transaction was concluded. The correspondence and arguments submitted to the SEC in *Airco* ably demonstrate that the confusion continued into 1977 (Ex. D–1877).

The testimony of DePonte, more than 10 years after this event, is convincing. He knew that purchase accounting should not apply to the balance sheet so as to permit the step-up in basis of the assets. The SEC was properly concerned about this. The dangers involved in permitting a step-up in basis between companies under common control are apparent.

DePonte properly reasoned that THC was, in fact, the surviving company. Economic substance should prevail over legal form if there is a difference. APB No. 4, Section F–12 (Ex. P–124). A determination was made by all involved, including law firms and directors of both companies, that THC would be the surviving entity that would continue to report to the stockholders and to the SEC. THC, in fact, became the new owner of the assets and liabilities that had formerly been owned by APG. Historically, THC was the dominating company in terms of assets, stockholders' equity, revenues, and earnings. THC revenues from its operations at March 31, 1971 were over $75 million, almost 400 times more than APG's revenues after excluding THC's dividends to APG. APG on its own lost over $500,000

for the year ending March 31, 1972. THC's earnings were in excess of $1,500,000 and its assets were almost ten times those of APG, excluding APG's investment in THC stock. Stockholders of both companies had a predominant investment interest in THC.

In this case, the "substance" was the same as the "form." The "ant" (APG) first acquired control over the "elephant" (THC) in a series of purchases, but in the end, the "elephant" swallowed the "ant." Plaintiff contends that swallowing of the "ant" resulted in the "elephant's" death. The causation question will be addressed later. After the reorganization, APG no longer existed. There were only individual shareholders of THC, none of whom had control. Before reorganization, minority shareholders of THC could not elect a Board of Directors and THC was under the direct control of a single majority stockholder (APG) who could dictate its destiny. After the reorganization, that control block was eliminated. It is impossible to conclude that the minority interest in THC was, in fact, "acquired" so as to require purchase accounting.

APB Opinion No. 16 gives no guidance as to *when* there has been the acquisition of a minority interest—only *how* to account for it if there has been such an acquisition.

Paragraph 70 of Opinion No. 16 gives some help with respect to the "acquirer" versus the "acquired." It provides that a corporation that incurs liabilities to obtain assets of another company is clearly the acquirer. The substance of this reorganization was that THC assumed liability for assets of APG. It is difficult to say that THC "issued" stock. While that was done in form, in substance APG shareholders got THC stock that APG already owned and the percentage of ownership in stock, as far as the minority stockholders were concerned, remained substantially the same. I accept the reasoning of the defendant's experts that the minority interest of THC was not acquired and that THC was properly treated as the acquirer.

---

**4.** *Airco-AIG Consolidation* (Ex. D–1877) and *CCH–CT Reorganization* (Ex. D–2309).

Plaintiff contends that defendant improperly mixed accounting methods by utilizing purchase accounting with respect to the income statement and pooling of interest accounting on the balance sheet, thereby permitting a survival of the THC earnings in the income statement without showing the losses of APG. Plaintiff contends that this was a business combination within the meaning of APB Opinion No. 16 and that, therefore, Paragraph 43 requires that a single method of accounting should be applied to the entire combination and "part-purchase, part-pooling" is not acceptable.

Plaintiff's witness Buckley characterizes defendant's method of accounting for the merger as part-purchase, part-pooling for two reasons. First, APG's acquisition of 56% of THC was accounted for as a purchase, but the acquisition of the final 44% was accounted for on the balance sheet in a manner similar to pooling. Second, defendant used the pooling method for the balance sheet and the purchase method for the income statement. I cannot accept the logic of this argument. To do so would require that I conclude that this reorganization was a business combination and, therefore, covered by APB Opinion 16, in spite of the specific language in Paragraph 5 which provides: "The term business combination in this Opinion *excludes* a transfer ... of net assets or exchange of shares between companies under common control ..., such as between a parent corporation and its subsidiary ...." (emphasis added). Further, Paragraph 43, by its terms, is directed towards situations where there is an acquisition of some or all of the stock held by minority shareholders of a subsidiary. I have previously concluded that that was not the situation in this reorganization.

All the witnesses agreed that it was unusual to apply purchase accounting on the income statement and pooling of interest accounting on the balance sheet. No witness could recall any similar situation since the issuance of APB Opinion 16. Defendant's witness, Larsen, on a cursory review of the matter, described it as a "flagrant example of creative accounting." He explains why he first arrived at that opinion, and later concluded that the accounting used in the Reorganization was indeed "creative" but in the best sense of that word. His explanation is impressive. It is apparent that this was a unique situation and required careful analysis and judgment. While various opinions were expressed, no one cites any authority to preclude the method of accounting used except Opinion 16 and the interpretations issued thereafter. The position adopted by Coopers & Lybrand (C & L), who succeeded PMM as THC's auditors in 1973 is informative. Allan Yasue, audit manager for C & L on the March 31, 1973 THC consolidated financial statements, testified that C & L was aware of PMM's rationale for its accounting treatment for the reorganization. He testified that C & L reviewed the manner in which the reorganization had been accounted for. This was absolutely necessary to their auditing for the succeeding years. While C & L did not reaudit the work of defendant and had no duty to do so, it did have a duty to disclose any violations of GAAS and GAAP that came to its attention. The testimony was that they were never aware of any evidence that the defendant had not complied with GAAS with respect to the audit of March 31, 1972, except for the adjustment of future income tax benefit of APG. While the record on this exception is not clear, the memorandum from Hubert Vogt to Louis Levy of July 23, 1973 indicates the nature of that disagreement as a bona fide position on the part of both companies (Ex. P–259). It was not related in any way to the method of structuring the reorganization.

APB Opinion No. 16 became effective October 31, 1970. DePonte's first letter to THC came December 11, 1970. Interpretation No. 26 was issued December of 1971. The critical letter of analysis was written by DePonte to the SEC January 14, 1972. Defendant's manual and the manual of Arthur Anderson & Co., both available to DePonte, reflected the confusion. Subsequent interpretations have reflected the confusion that exists between the experts in this case. The experts for both plaintiff and defend-

ant are extremely competent in their fields but the practical experience of plaintiff's experts is somewhat limited. All, on both sides, had the benefit of analyzing the transaction in hindsight.

I conclude that the plaintiff has failed to prove by a preponderance of the evidence that the defendant was negligent in the method of accounting for the transaction. It is not necessary to endorse such a procedure for application to all situations. Here it was appropriate. Even if Opinion No. 16 applied and purchase accounting should have been used throughout the transaction, the results would have not been significantly different with THC as the acquirer. The income statement on the pro forma statements would not have changed and the figure reported as retained earnings on the balance sheet would have been somewhat higher.[5] Under these circumstances, plaintiff has failed to prove that the merger would not have occurred, either by reason of director action or minority stockholder action.

Analysis of the testimony and the exhibits reflects thoughtful accounting decisions based on judgment in difficult matters. The occasional disagreements between defendant and the SEC and even among individuals within the defendant's organization reflect the same confusion that has existed in the profession consistently since Opinion 16 was issued.

**5.** The figures furnished by plaintiff for comparison (Ex. P–875) are from the audited statements of March 31, 1972. These figures, of course, were not available to defendant in preparing the pro forma financial statements for the APG proxy statement and for the THC board.

**6.** "March 3, 1972

American Pacific Group, Inc.
Honolulu, Hawaii
Gentlemen:
Under the date of May 12, 1971, we reported on certain financial statements of American Pacific Group, Inc. and American Pacific Group Inc. and subsidiary companies contained in the proxy statement of American Pacific Group, Inc. (APG) dated February 3, 1972.
We have not made an examination of the financial statements nor audited the records or transactions of APG or of APG and its consolidated subsidiaries for the three months ended

## 2. Comfort Letter.

█ The Plan of Reorganization and Exchange Agreement between THC and APG provided that the obligations of THC under the agreement were subject to the following condition:

"(f) THC shall have received from Messrs. Peat, Marwick, Mitchell & Co. a 'comfort letter' dated immediately prior to the Closing, stating that on the basis of a limited review (as distinguished from an examination made in accordance with generally accepted auditing standards) of the latest available interim financial statements of APG and its subsidiaries, inquiries of officers of APG responsible for financial and accounting matters and other specified procedures, nothing has come to their attention which in their opinion caused them to believe that during the period from the date of the last balance sheet made available pursuant to Section 3(c) above to a specified date not more than five business days prior to the Closing Date, there has been any material adverse change in the financial position or results of operation of APG or its subsidiaries."

Pursuant to that paragraph, defendant issued a letter dated March 3, 1972 to APG (Ex. P–201). Because of its significance, it is set forth in full in the footnote.[6]

June 30, 1971. Accordingly, we express no opinion on such financial statements contained in the proxy statement. Our examination of the financial statements for the year ended March 31, 1971 referred to in our report dated May 12, 1971, was not directed to any closing at June 30, 1970, which would have been necessary to enable us to express an opinion as to the fairness of the income determination for the three-month period then ended.
At your request, we have made a review from June 30, 1971 to February 29, 1972 which does not constitute an examination in accordance with generally accepted auditing standards. Accordingly, we have:
(a) in the absence of consolidated interim unaudited financial statements, read the interim unaudited financial statements of APG (unconsolidated) and of its subsidiaries as of the dates and for the periods set forth hereunder. These are the latest available interim financial statements of the listed companies:

The "comfort review period" was June 30, 1971 to February 29, 1972. Plaintiff contends that there was a material adverse change in the financial position or results of operations of APG or its subsidiaries during this period and that these changes either did or should have come to the attention of defendant had defendant exercised reasonable care. It is necessary to determine whether there was a material adverse change in the financial position or results of operations of APG and if so, whether defendant did or should have discovered them. Analysis of the latter question must be made on the basis on the information available to the defendant at the end of the comfort period. Determining what facts were available at February 29, 1972 is extremely difficult. Plaintiff's presentation of the testimony, exhibits, and proposed findings of fact with respect to this issue has assumed numerous facts that are compiled from the audited statements of March 31, 1972, which were not completed until June, 1972. Plaintiff proposes findings of fact that the witnesses Crossley and Rex Kuwasaki reasonably believed that at the

APG:
January 31, 1972 and the ten months then ended
The Hawaii Corporation:
January 31, 1972 and the ten months then ended
American Pacific Life Insurance Company, Limited:
December 31, 1971 and the year then ended
American Pacific Life Insurance Company of the Far East:
No interim unaudited financial statements available
American Pacific Properties, Inc.:
December 31, 1971 and the nine months then ended
American Pacific Casualty Agency, Inc.:
December 31, 1971 and the nine months then ended
American Pacific Management Corp:
January 31, 1972 and the ten months then ended
W.J. Burke Construction, Inc.:
December 31, 1971 and the year then ended
Delta Contractors, Inc.:
January 31, 1972 and the seven months then ended
P A Realty Management Co., Inc.:
January 31, 1972 and the ten months then ended
Tel-A-Com Hawaii, Inc.:
December 31, 1971 and the nine months then ended
Mortgage Consulting & Financing Company, Inc.:
No interim financial statements available
New Ventures, Ltd.:
No interim financial statements available
The Medi-Fund Corporation:
December 31, 1971 and the eleven months then ended
Oil, Gas and Minerals Development Corp.:
June 30, 1971 and the year then ended
(b) read the minutes of the meetings of the Stockholders and Board of Directors of APG and The Hawaii Corporation held during the period from June 21, 1971 through December 13, 1971 and from June 30, 1971 through January 17, 1972, respectively, included in the minute books at February 29, 1972, officials of the companies have advised us that the minutes of all meetings through those dates were set forth therein; and

(c) had discussions with officials of APG and The Hawaii Corporation responsible for financial and accounting matters as to transactions and events subsequent to June 30, 1971.

Our review of the companies for the periods subsequent to the interim financial statement dates detailed above has necessarily been confined largely to consultation with responsible officers and employees of APG and The Hawaii Corporation.

Our work did not extend to the period from February 29, 1972 to the date of this letter. It should be understood that this limited review would not necessarily reveal adverse changes in the financial position or results of operations of the companies or inconsistencies in the application of generally accepted accounting accounting [sic] principles. Subject to this explanation and based upon the aforementioned limited review, nothing has come to our attention which causes us to believe that during the period from June 30, 1971 to February 29, 1972 there has been any material adverse change in the financial position or results of operations of APG and its subsidiaries on a consolidated basis.

The terms 'financial position' and 'results of operations' are used in their conventional accounting sense; accordingly, they relate to the consolidated financial statements of the business as a whole and have the same meaning when used in this letter as they have when used in our report included in the proxy statement.

It is understood that this letter is not to be quoted, or referred to, in whole or in part, in any literature except for any reference to it in a list of closing documents.

Very truly yours,

/s/ Peat, Marwick, Mitchell & Co."

end of the comfort period there had been no material changes and that APG was having a very successful year (Plaintiff's Proposed Findings of Fact, pp. 3–8). These men reviewed the interim financial statements of APG and its subsidiaries regularly, were knowledgeable businessmen, and had constant access to the APG records. Kuwasaki, as President of APG, certified there had been no material changes. All directors of THC had available the same interim statements upon which defendant based its comfort review.

Defendant's duty in this regard is defined by paragraph (f) of the agreement quoted above and by the letter of March 3, 1972 set forth in the footnote. Its responsibility was confined to certifying "that nothing has come to their attention which in their opinion caused them to believe" there had been a material adverse change based on "a limited review (as distinguished from an examination made in accordance with generally accepted auditing standards) of the latest available interim financial statements of APG and its subsidiaries, inquiries of officers of APG responsible for financial and accounting matters and other specified procedures."

The limits of the examination actually conducted were set forth in defendant's letter of March 3, 1972. The difficulties we are now encountering were made clear in that letter. There were no audited statements or closings for APG or any of its subsidiaries at either the beginning or the end of the comfort period. The last audited statements were March 31, 1971. Only company-prepared interim statements were available for varying periods of time towards the end of the comfort period as itemized in the letter. APG's operating income and retained earnings were substantially affected by THC earnings. The last THC statement of January 31, 1972 was an interim unaudited statement. There were no consolidated interim unaudited statements for APG and its subsidiaries for any part of the comfort period.

Defendant's letter made it clear that "this limited review would not necessarily reveal adverse changes in a financial position or results of operations of the companies or inconsistencies in the application of generally accepted accounting principles." It further provided that the material adverse change was considered in connection with the consolidated operations of APG as distinguished from any individual company.

The letter of March 3, 1972 is the limit of defendant's commitment. Plaintiff contends that defendant drafted the language in the Exchange Agreement and that defendant's responsibility for the analysis is controlled by Statements on Auditing Procedures No. 35 (Stat. 35), issued by the Committee on Auditing Procedures of the American Institute of Certified Public Accountants (Ex. P–102).

Stat. 35 relates to letters by accountants to underwriters. There is, of course, a difference between a letter to an underwriter contemplating a stock or bond issue and a letter to a sophisticated and knowledgeable board of directors, many of whom are actually operating the companies being acquired. In any event, it is apparent that Stat. 35 imposes no requirements on defendant in this case. Paragraph 16, upon which plaintiff relies, simply gives examples of the period that might be compared to the comfort period. It specifically provides that the underwriting contract may specify the period. From this paragraph, plaintiff concludes that defendant had an obligation to make a comparison of the comfort period with the corresponding period of the preceding year or with some similar comparable period. I find no such obligation. The extent of the examination was fully disclosed by the letter. Neither the Exchange Agreement nor the letter set forth the requirement for such a comparison. Not only was the Board of THC composed of knowledgeable and experienced directors, but numerous competent lawyers were involved, representing both THC and APG. THC accepted the comfort letter as limited.

Paragraph 16 of Stat. 35 recites that some accountants believe the period with which comparison is made should be men-

tioned in the letter even though not specified in the underwriting agreement. By its terms, this language is not mandatory. Provisions of the agreement, the terms of defendant's letter, and the conduct of defendant must be evaluated, keeping in mind the circumstances surrounding the reorganization at that time, rather than in hindsight. THC knew that APG and its subsidiaries had a record of losses and limited operating experience. While there were some indications of hope, APG's consolidated income was insignificant compared to THC's. THC wanted APG and its subsidiaries in order to be rid of a dominant shareholder who would not permit its majority control to be diluted by the infusion of additional equity capital.

Exhibit P–546 is the packet of materials furnished to the directors in August, 1971, when they were considering the reorganization. It projected substantially more income to APG than past operating statements justified. The audited statements of APG set forth in the proxy (Ex. P–200), however, demonstrated to the directors of THC a very poor operating pattern. Without the earnings of THC, APG was nothing except a chance. It is evident that the directors of both boards knew this. Robert Chapman, THC vice president of finance, provided the directors at the August meeting with a pro forma financial statement showing the estimated combined earnings of THC and APG as $2,603,000 for the year ending March 31, 1972. It is interesting to note how closely this estimate compares with the actual combined earnings of $2,541,988, as reported by PMM in the audited financial statement for the same period.

Exhibit P–546 indicated the appropriate exchange ratio based on earnings would be one share of THC stock for each 1.26 of APG stock. When the committee was selected to establish the ratio, the THC Board instructed them to negotiate a ratio between 2.5 APG shares for one THC share and 3.0 APG shares for one THC share. The committee ultimately decided on a ratio of 2.65 APG shares to each one share of THC stock, thereby totally ignoring the comparison of earnings projected in Ex. P–546.

Joseph Wikoff, a CPA with defendant, worked on the comfort letter. While he was not experienced and had not previously done a comfort letter,[7] he worked under the supervision of John Allen, a very capable and experienced CPA. He studied the professional and firm literature with respect to comfort letters and worked under the direction of Allen. He attempted to make comparisons with the comfort period but because of the problems related in the comfort letter, was unable to do so. After consultation with Allen, he started with the retained earnings as shown on the last audited statement which was March 31, 1971. From that he integrated, as best he could, the multiple interim, unaudited statements from APG and its subsidiaries. The interim statements were available for different ending periods and different lengths of time. He arrived at an analysis that indicated a loss of approximately $30,000 (Ex. P–202, PMM work paper AA–6/1).[8]

While plaintiff criticizes this approach, even with the benefit of hindsight and extensive study, none of the experts has been able to make a comparison of the comfort period with any comparable period. Plaintiff's experts make their comparisons based upon the audited statements of February 29, 1972, which were not available to Wikoff at the time of the letter of March 3, 1972. Even utilizing these figures, all experts had to go through a series of prorations which are unreliable in the light of the

---

7. In that respect, he was no different than some of the experts who testified.

8. At the bottom of PMM work paper AA–6/1, Wikoff erred in labeling the $684,351 of retained earnings as "@ 6–30–71." It is obvious that this should have been from the March 31, 1971 audited statements as shown at the top of AA–6/1. However, it is clear that he was starting with the last audited statements and taking the interim statements to determine the loss that had occurred up to the end of the comfort period.

inconsistent pattern of operation of APG and its subsidiaries.

Plaintiff offers Exhibit 214 to establish that APG had a "swing" of approximately $1.3 million in comparing the results of the comfort period with the corresponding period of the prior year. Plaintiff's experts used as the comparative period, the nine months ending March 31, 1971. They divided that figure by nine to arrive at the monthly results and multiplied the monthly results by seven to obtain the comparative figure for the seven-month comfort period. I find this unreliable in determining whether or not there was a material adverse change in the financial position and results of operation of APG.

Exhibit 214 shows that approximately $250,000 of the "swing" was in the amount of earnings received from THC. Almost $200,000 of the "swing" came from W.J. Burke Construction Co. and New Ventures, neither of which were owned by APG during the compared period. The Burke losses on Exhibit 214 are approximately $188,000. William Pruyn, a director and officer of THC and its man in charge of construction, fully understood the extent and the nature of the Burke losses as did the rest of the THC Board.

Almost $400,000 of the "swing" occurred in connection with APG's subsidiary, American Pacific Life Insurance Co. (APL). This was a comparatively new company reporting its income on a statutory basis which required that all costs of acquiring and producing new insurance policies be expensed. Under such circumstances, increased operating costs and expenses often indicate more profits ultimately, even though the expenses increase sharply at the outset. One Hundred Eighty-Six Thousand Dollars of this loss resulted from the purchase of $36 million in life insurance policies. Pursuant to statutory accounting, this entire cost had to be expensed in 1971. These purchased policies, along with others, were later sold for a profit.[9]

Defendant's expert Waterfield used a similar method of prorating on a monthly basis but for a different time period (Ex. D–2349). Waterfield makes a comparison of the comfort period with the three-months' period ending June 30, 1971, which is the period immediately preceding the commencement of the comfort period. He takes the APG losses for the three months ending June 30, 1971, subtracts those losses from the losses shown on the unaudited statements for the ten-months' period ending January 31, 1972, and arrives at the estimated losses for APG for the comfort period of $615,938. In determining the expectations for the comfort period, he deletes the extraordinary income in the June 30, 1971 statement, divides by three to get the monthly losses for the three months just prior to the comfort period, and then multiplies that figure by the seven months to get predicted losses of $569,100. This he compares to the estimated losses during the comfort period of $615,938. Thus, even including the losses of APL, Burke and New Ventures, there is no substantial change. Plaintiff's experts do not convince me that their method of comparison is any more reliable than defendant's. Different results achieved by the experts, depending on the differing time periods and the prorations used, indicate the problems faced by Wikoff and Allen in attempting any comparison. The reasons for the particular language in the plan of reorganization become increasingly clear.

Plaintiff contends that defendant should have written down APG's 5% interest in Falcon Capital Corp. (FCC) because of the losses sustained by FCC. It is clear that Wikoff knew of substantial losses by FCC. He talked to John Melton, who is recognized as an outstanding insurance expert. Melton was vice president in charge of insurance for APG, and vice president and treasurer of APL. He subsequently became president of APL and is now the president of Blue Cross of Texas. He was persuasive

9. The record is unclear as to the amount of the profit but it is clear that this expense was later fully recovered in income.

not only to Wikoff but to the THC Board as to the value of FCC. He represented a value to the THC Board just two weeks after the comfort review that fully justified the evaluation on the APG books at the time of the reorganization. In any event, the THC Board had the interim statements and knew of the losses. I cannot conclude defendant had a duty on a comfort review to write down the investment because it was higher than the value shown on the statutory filing or because of losses from facts that were fully disclosed to the THC Board.

Plaintiff further contends that defendant improperly included New Ventures's profits on defendant's comfort review work paper AA–6/1 because those profits included "straw sales." The comfort review work papers indicate there were three sales by New Ventures with buy-back arrangements with a limited dollar exposure. New Ventures was acquired by APG June 30, 1971 for the stated purpose of acquiring managerial talent and expected future profits. It had no operating history as a subsidiary of APG, as the directors of THC knew. Defendant had no audit responsibilities for New Ventures until the March 31, 1972 audit. In the light of the reasons for the acquisition of New Ventures and absent any audit responsibilities, defendant had no responsibility on a comfort review to adjust profits because of the three buy-back letters referred to in the work papers. I accept Wikoff's testimony that there were no "straw sales" disclosed until April 5, 1972.

I find that defendant's review and analysis of the comfort period were consistent with the nature of their commitment and with good accounting practices existing at that time. The outline of activities in the comfort review as contained in Exhibit 202 indicates the scope of the review. Work papers, exhibits, and the testimony are persuasive that, where defendant discovered areas of concern, it did a cause analysis for those changes. In this regard, defendant relied upon and had a right to rely upon management representations for the causes of the changes. Defendant's duty was to a knowledgeable and experienced board of directors. Those Board members had the same interim statements of APG and its subsidiaries and the same audited statements for prior periods as defendant's had. The parties have agreed that, during the entire time THC was considering the merger, THC's directors were aware of their duty to act in good faith and in the best interest of THC and that they, in fact, intended to do so. Joint Stipulation 108. This stipulation is supported by the evidence. I find all THC directors, including those who were APG directors, were sincerely motivated to benefit THC by the reorganization.

I further find they were motivated to complete the reorganization in order to eliminate the APG control block of stock to make more equity capital available through a stock offering. Subsequently and in October 1972, they made the decision not to have a public offering because of market conditions. Crossley's testimony as to the reasons for this and the ultimate failure of THC persuades me that defendant's actions had nothing to do with THC's problems. I am satisfied that the THC Board would have proceeded with the reorganization, irrespective of the conduct of the defendant. Present testimony of Board members that, under certain circumstances, they would not have voted for a reorganization is understandable but unreliable. No one likes to accept the blame for a disaster. They have been made defendants and undoubtedly have been embarrassed by the failure of such an organization as THC. In hindsight, it is always easy to decide that someone else was to blame. They have done this indirectly by indicating that, based upon certain facts, they would have voted against the reorganization.

Plaintiff has also failed to prove that any shareholder would have filed a successful minority stockholders' suit to prevent the reorganization. Crossley persuasively presented the reasons for the reorganization, and THC had its problems with APG as controlling shareholder. The audited statements of March 31, 1972 for THC showed consolidated net earnings from op-

erations before extraordinary items of over $2 million. Note two shows a reduction of over $1 million in retained earnings, assuming the reorganization had occurred as of April 1, 1970. Yet no one complained until many years later and after financial disaster had occurred. Defendant was discharged by THC, not for any conduct alleged in this case, but because DePonte would not agree with Crossley's view on the method of accounting for the sale of the Pacific Trade Center.

### 3. APL–FCC–Continental Transaction.

■ Plaintiff charges that defendant's audit of THC's financial statements of March 31, 1972 with respect to the APL–FCC–Continental sale of insurance failed to conform to Generally Accepted Auditing Standards (GAAS) in allowing $688,000 of income to appear in THC's financial statements of March 31, 1972. Obviously, this had no effect on the decision to reorganize because the March 31, 1972 audited statements were not generated until many months after the reorganization was completed. In any event, plaintiff has failed to prove defendant violated GAAS.

FCC was incorporated in 1964 in California as Agents Investments, Inc. Prior to June 1970, the company was also known as Falcon Financial Corp. From 1966 until 1969, it engaged primarily in the wholesale marketing of "deposit term life insurance" underwritten by Valley Forge Life Insurance Co. In April 1969, FCC began marketing the deposit term life insurance policy underwritten by APL (a wholly-owned subsidiary of APG).

In January 1969, FCC organized Falcon Life Insurance Company under the laws of Arizona and APL purchased from Falcon Life at $6.00 per thousand of face amount, $51,204,360 of a 10-year term insurance underwritten by Valley Forge and received $1,146,453 in premium income.

In 1970, FCC began marketing the deposit term life insurance policy underwritten by International Life Insurance Co. of Buffalo. In 1970, APL purchased from Falcon Life at $6.00 per thousand of face amount, $35,532,515 of a 10-year term insurance underwritten by Valley Forge and received $868,592 in premium income.

On December 31, 1971 APL purchased from Commercial Bankers Life (CBL), a subsidiary of APL, $36 million in term-life insurance at $6.00 per thousand. In March of 1972, APL sold to Continental Bankers Life (Continental) $100 million of term life insurance which included the $36 million in insurance acquired by CBL. Continental was not a related company and the sale to Continental was an arms-length sale for fair market value at a profit. FCC borrowed $1.6 million to loan to Continental to make the purchase and FCC got a commission of $125,000, plus a general agency contract with Continental which provided for guaranteed commissions over a nine-year period to repay the loan with bonuses to pay the interest.

On March 20, 1972, the THC Board unanimously resolved to acquire FCC. Before this decision was made, Crossley and Kuwasaki were directors of FCC, as well as of THC. In September of 1972, THC acquired all of FCC's outstanding capital stock in exchange for 100,000 shares of THC stock and a promise to issue 300,000 additional shares if FCC met certain earnings goals. Before the Board's decision to acquire FCC, the directors of THC were presented with a report on the history of FCC and an evaluation of the corporation. At the time THC voted to acquire FCC, the THC Board was aware that FCC had experienced a loss of approximately $1.2 million for the fiscal year ended June 30, 1971 and a loss of more than $240,000 for the seven months ended January 31, 1972.

At the time of this transaction, life insurance companies reported income on a statutory basis, which is essentially the same as cash accounting. Income was reported when received and expenses were reported as incurred. There were no pronounced Generally Accepted Accounting Principles for life insurance companies at that time and therefore, APL properly expensed its cost for acquiring $36 million in policies in its statutory reporting as of December 31,

1971. Income from the sale by APL to Continental was properly shown in the year of sale. While this resulted in a distortion in the reported results, it was proper accounting at that time. Subsequently, Generally Accepted Accounting Principles have been adopted to eliminate that distortion. In any event, defendant fully disclosed the distortion in the footnotes to THC's and APL's financial statements and in the reports to the SEC.

Defendant accepted assurances from the Chief Executive Officer of Continental by letter to Arthur Young that the bonuses to be paid to APL would be adequate to pay the interest. Plaintiff questions defendant's reliance on this non-contractual assurance and contends that defendant should have reduced the amount of the profits by the amount of the interest because of the contingent nature of the bonus arrangement. Under the circumstances, I cannot conclude that defendant was negligent, and in any event, the assurance proved to be accurate.

With respect to the timing of the purchase and sale, Melton testified that management made a choice as to when to take the profits. In a new life insurance company following statutory accounting, where there is a history of marketing policies and where expenses are high in initially acquiring policies, I cannot conclude that defendant either had enough information or had any other basis for invoking the provisions of AICPA's Committee on Ethics Opinion No. 8 to Rule 2.02, 1959.[10]

### 4. Net Operating Loss Carryforward

█ It is plaintiff's position that defendant improperly included $1,510,000 of APG's prior losses as a current asset on THC's audited balance sheet of March 31, 1972. Once again this was immaterial to the decision to reorganize since it came many months later. Plaintiff argues that this increased the retained earnings and the working capital and presumably, that plaintiff is damaged because the THC Board voted dividends which would not have otherwise been paid. It is entirely speculative that such a condition occurred. In any event, I find that defendant's decision in this regard was based on reasonable accounting judgment. In light of THC's past history of earnings, management's projected earnings for fiscal 1973, and the likelihood of a significant gain on the sale of the Pacific Trade Center, defendant was justified in concluding beyond a reasonable doubt that the APG losses would be utilized to offset future profits. I accept the analysis and the logic of the witness Waterfield with respect to this matter.

### 5. Amortization of New Ventures Cost

█ New Ventures was acquired by APG on June 30, 1971 in exchange for APG stock. The purpose of the acquisition was to obtain management talent and future profits. It had no operating history as a subsidiary of APG. Plaintiff contends that the acquisition cost of New Ventures was improperly allocated by APG and that defendant should have discovered this and made the adjustment in connection with its comfort review. While any adjustment in allocation of excess cost, as contended by plaintiff, would have reduced earnings by New Ventures during the comfort period, it would have relieved future earnings of any offsetting cost amortization and made future earnings higher. When the March 31, 1972 audit was being conducted and after the reorganization had been completed, Frank Marchewka, another of defendant's auditors, recommended that excess cost should be allocated to certain condominium units under construction, and written off as the units were sold. He recognized, however, that there were valid arguments for amortizing a portion of the excess cost on a systematic basis over a period of years since

---

**10.** This opinion provides:

"In a circumstance where a member believes the financial statements are false or misleading as a whole or in any significant respect, it is the opinion of the Committee that he should require adjustments of the accounts or disclosure of the facts, as the case may be, and failing this the independent auditor should refuse to permit his name to be associated with the statements in any way."

the company was expected to generate revenues in the future.

Coopers & Lybrand succeeded PMM as THC's auditors in April, 1973. To complete the audit of THC's March 31, 1973 financial statements, C & L necessarily had to review PMM's decision regarding allocation of the cost of New Ventures. C & L found no errors in PMM's treatment of the transaction at the time.

In light of the reasons for the acquisition of New Ventures by THC and APG, and absent any audit responsibilities in the comfort period, plaintiff has failed to prove responsibility on the part of defendant to reallocate the excess cost on APG's books.

### FRAUD

Plaintiff alleges that PMM is liable for fraud because the comfort letter, the financial statements and the pro forma balance sheets that PMM prepared contained material misrepresentations upon which THC relied in embarking on the THC–APG reorganization and related transactions. There is no contention of intentional fraud. Plaintiff asserts the misrepresentations were made with reckless disregard for their truth or falsity.

■ To prove fraud, plaintiff must show that (1) the defendant made a false representation of material fact, (2) defendant intended to induce the plaintiff to act, (3) the representation was made by the defendant with knowledge that it was false (or without knowledge of its truth or falsity), but plaintiff reasonably believed it was true, and (4) the plaintiff relied to his damage. *Bank of Hawaii v. Allen*, 2 Haw.App. 185, 628 P.2d 211 (1981); *see also, Kang v. Harrington*, 59 Haw. 652, 587 P.2d 285 (1978). The "knowledge" requirement is satisfied if it is shown that the representations were made with reckless disregard for their truth or falsity. *Anderson v. Knox*, 297 F.2d 702, 720 (9th Cir.1961), *aff'g*, 162 F.Supp. 338 (D.Haw.1958), *cert. denied*, 370 U.S. 915, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962).

■ My findings with respect to the negligence claim are dispositive of plaintiff's fraud claim. Plaintiff has failed to prove that the comfort letter, financial statements, or pro forma balance sheets prepared by defendant contained material misrepresentations.

### BREACH OF CONTRACT

PMM entered into written and oral contracts to perform auditing and accounting services for THC. Plaintiff's breach of contract claim is based upon the allegation that PMM negligently failed to perform its contractual undertakings with due care.

Plaintiff contends that PMM breached its express and implied duties and obligations under the contracts by negligently and recklessly acting as previously set forth, and seeks contract damages including all compensation paid by plaintiff to PMM for the services it rendered.

■ The requirement that an accountant or auditor exercise that degree of skill and competence reasonably expected of persons in those professions is implied in a contract for professional services. *Bancroft v. Indemnity Insurance Co. of North America*, 203 F.Supp. 49, 52 (W.D.La.1962). Liability follows for breach of contract if there is negligence. *See Gammel v. Ernst & Ernst*, 245 Minn. 249, 72 N.W.2d 364 (1955); *see also*, by analogy, *Higa v. Mirikitani*, 55 Haw. 167, 172, 517 P.2d 1, 4 (1973) (attorney's malpractice).

■ In concluding that plaintiff failed to prove by a preponderance of the evidence that defendant was negligent in performing auditing and accounting services for plaintiff, I have also necessarily concluded that plaintiff cannot recover for breach of contract.

### CAUSATION

■ In order to prevail on a claim of professional negligence, a plaintiff must establish that defendant's negligence was the proximate cause of plaintiff's loss. *See Chun v. Park,* 51 Haw. 462, 465–66, 462 P.2d 905, 907–08 (1969). Defendant's negligent conduct is the proximate cause of harm to plaintiff if the conduct is a "substantial

factor" in bringing about the harm. *McKenna v. Volkswagenwerk,* 57 Haw. 460, 464, 558 P.2d 1018, 1022 (1977).

In earlier proceedings in this case, Judge Pence commented that THC's course of expansion eventually resulted in THC's bankruptcy. I interpret this comment to refer to the overall scheme of THC management and directors to make THC into a major Pacific financial institution. I do not interpret it to mean that the APG–THC reorganization itself caused THC's collapse. Having had the benefit of the testimony of the witnesses and a review of the exhibits, I conclude that plaintiff has failed to prove either

(1) That defendant's actions or lack of actions were a substantial factor in bringing about the reorganization; or

(2) That the reorganization was a substantial factor in the ultimate demise of THC.

Paragraph (1) has been addressed previously. With respect to paragraph (2), the reorganization added debt and new, speculative businesses to THC. Nevertheless, Crossley testified that the devaluation of the yen, the disaster in the textile division (unrelated to APG) and changes in construction patterns were substantial factors in the demise. This testimony is persuasive. The ability, or lack thereof, of the officers and directors may also have been significant. THC's future under these circumstances without the reorganization but with APG as the controlling shareholder was entirely unpredictable. Without the reorganization, THC might have survived somewhat longer but that is entirely speculative.

## CONCLUSION

Plaintiff has failed to prove by a preponderance of the evidence that defendant was negligent in performing or failing to perform auditing and accounting services for plaintiff. Defendant is not liable for violations of federal or State of Hawaii securities violations, common law fraud, or breach of contract. Defendant is entitled to prevail on each of plaintiff's contentions.

This opinion shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.